MARIANNE CROCKER ELRICK, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5776–68.   Filed August 2, 1971.

*Sidney D. Rosoff*, for the petitioner.
*Michael K. Phalin* and *Joseph G. Giannola*, for the respondent.

QUEALY, *Judge:* The respondent determined deficiencies in the Federal income tax due from the petitioner as follows:

| Year | Deficiency |
|------|-----------|
| 1965 | $17,593.82 |
| 1966 | 12,549.16 |

Concessions having been made, the only question we have before us for decision is whether legal expenses incurred by the petitioner for the assertion and settlement of actions brought by petitioner against the estate of her deceased father are deductible during the years in question as ordinary and necessary expenses paid or incurred for the production of income, or in the alternative, whether petitioner may amortize these legal fees over her life expectancy.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto, are incorporated herein by this reference.

The petitioner, Marianne Crocker Elrick (hereinafter referred to as petitioner), was a legal resident of Caracas, Venezuela, at the time of the filing of the petition in this case. Petitioner filed her individual income tax returns for the calendar years 1965 and 1966 with the district director of internal revenue at New York, N.Y. Petitioner used the cash receipts and disbursements method of reporting her income for those years.

Petitioner was born the daughter of Charles Crocker and Virginia B. Crocker on June 14, 1933. Petitioner's parents entered into a written separation agreement on October 25, 1937, and in December 1937, the parents obtained a legal divorce.

Pursuant to the terms of the separation agreement of October 25, 1937, and as partial consideration for this agreement, petitioner's father created a trust for the benefit of the petitioner on November 1, 1937. The corpus of this trust consisted of 5,000 shares of the capital stock of Provident Securities Co., a closely held California corporation (hereinafter referred to as Provident). The trust was to remain in existence during the lives of the petitioner and her father.

The terms of this trust provided that during the joint lives of petitioner and her father, the trustees were to pay over all of the net income of the trust to the settlor, Charles Crocker, until petitioner attained the age of twenty-one (21) years. Commencing with her 21st birthday, petitioner was to receive annually the first $10,000 of the annual net income of the trust if she were unmarried at the time of the said birthday and so long as she remained unmarried. On the other hand, if she were married at the time of her 21st birthday or if she married subsequent to that time, she was to receive annually only $6,000 of the annual net income of the trust. In each instance, the balance of the net income was to be paid to the settlor, petitioner's father.

The terms of the trust agreement also provided that upon the death of her father, petitioner would receive annually the entire annual net income from the trust. In addition, the trust agreement provided that upon the death of her father, petitioner would receive one-third of the corpus of the trust upon attaining the age of 21 and one-half of the remaining corpus of the trust upon attaining the age of 35. The corpus remaining at the time of the petitioner's death was to be divided equally amongst petitioner's surviving issue, if any. Petitioner's father retained the right to revoke the trust agreement with the consent of petitioner's mother.

In 1955, petitioner, who was then married and 21 years of age, was entitled to income from the trust in the amount of $6,000 per year with the remainder of such trust income to be paid to Charles Crocker.

Virginia B. Crocker and Charles Crocker both remarried after their divorce in 1937. Virginia Crocker became Virginia B. Vroman. Charles Crocker's second wife was Marguerite Brokaw Crocker. Two children were born of this second marriage of Charles Crocker. The two children were Charles Crocker, Jr. and Daphne Crocker.

With the consent of petitioner's mother, petitioner's father revoked the trust agreement of November 1, 1937, on February 15, 1955. Petitioner's mother entered into the agreement only after consulting with the petitioner. Concurrently with this revocation agreement and as consideration for the consent of petitioner's mother to it, petitioner's father created a trust (hereinafter referred to as the second trust), also dated February 15, 1955, for the benefit of the petitioner. The

corpus of the second trust consisted of 2,200 shares of the capital stock of Provident and the trust was to remain in existence during the life of the petitioner.

The terms of the second trust provided that the petitioner was to receive the entire annual net income from the trust during her lifetime. The terms of this trust also granted the petitioner a power of appointment by will over the trust estate. However, the power could not be exercised in favor of the petitioner, her estate, her creditors, or the creditors of her estate.

Petitioner's taxable income increased substantially as a result of the revocation of the first trust and the creation of the second trust. Her income from the first trust would have been limited to $6,000; her taxable income from the second trust averaged approximately $31,000 for the years 1955 through 1961.

Petitioner's father died testate March 13, 1961. His will left one-half of his estate in trust for the benefit of his second wife, Marguerite Brokaw Crocker, with a power of appointment. The will also left one-fourth of his estate in trust for the benefit of Charles Crocker, Jr. One-third of the principal was payable to Charles Crocker, Jr., upon his attaining the age of 30. In addition, the will left one-fourth of his estate in trust for the benefit of Daphne Crocker. One-third of the principal was payable to Daphne Crocker upon her attaining the age of 30. The will expressly provided that petitioner should take no share in the estate.

Petitioner retained the services of the California law firm of Youngman, Hungate and Leopold and New York attorney Lawrence R. Condon to assert any rights which she might have to a share in her father's estate.

On April 27, 1961, petitioner filed in the Probate Court in the Superior Court of the State of California in and for the County of Monterey a contest and grounds of opposition to probate of her father's purported will. Petitioner challenged her father's will on the grounds that at the time of its execution her father was not of sound and disposing mind; that the will had not been executed and attested in the manner and form required by law; and that the will was the direct result of the undue influence of others.

Petitioner's probate action was demurred to and petitioner then amended her action. An answer to petitioner's amended probate action was filed on January 7, 1962.

On December 21, 1961, petitioner and her mother filed a complaint under No. 52507 in the Superior Court of the State of California in and for the County of Monterey for quasi-specific performance of a contract to make a will, or in the alternative, for a rescission of both

the revocation and trust agreements of February 15, 1955 (the second trust).

Under her claim for quasi-specific performance of a contract to make a will, petitioner alleged that in return for her mother's consent to the revocation of the trust agreement of November 1, 1937, her father promised to provide equally for petitioner in his will with his other two children after taking into account what petitioner received under the trust agreement of February 15, 1955. The defendants in petitioner's complaint in the Superior Court filed a demurrer thereto. The court overruled the demurrer, and an answer was then filed.

Petitioner entered into a written agreement on May 31, 1962, with the California law firm of Youngman, Hungate and Leopold and New York attorney Lawrence R. Condon as to the fees to be paid by petitioner in the event a settlement was effected before any disposition of either the equity suit or probate proceeding was commenced. The fee agreement provided that in the event of a settlement the petitioner would be required to pay over as legal fees 21 percent of the first $250,000 received in settlement and 18 percent of the next $500,000, or part thereof, received in settlement.

Petitioner's two legal actions were settled by agreement of the parties on May 13, 1963, prior to the commencement of any disposition in either case. The parties agreed that petitioner's probate proceeding should be dismissed and that the claims asserted in the second and third causes of action in petitioner's equity suit should be dismissed.

In addition, the parties agreed that the petitioner should be paid $250,000 in settlement of the claim for specific performance of a contract to make a will asserted in the first cause of action in the petitioner's equity suit. The agreement provided that payment should be made by transferring 909 shares of the capital stock of Provident (valued at $275 per share) to the trust created for the benefit of petitioner on February 15, 1955, the stock to be held, administered, and distributed in accordance with the provisions of that trust.

The parties further agreed that petitioner had the option to receive in cash, free of any trust, an amount not to exceed $275 for each share of Provident stock up to 227 shares which would not be placed in trust.

The decision to make payment of the settlement in shares of the capital stock of Provident was based on the fact that neither cash nor other marketable securities were available for such purpose. The decision to place the shares of the capital stock of Provident in trust with a responsible and experienced trustee was based on the fact that the successful operation of this family business required that a unified group of stockholders and directors be maintained.

As a result of the transfer of these 909 shares of Provident to the second trust, the corpus of this trust was increased to 3,109 shares of Provident stock, and the taxable income which the petitioner received from the trust increased by approximately 50 percent. The second trust provided the petitioner with her main source of taxable income. Petitioner's taxable income from the second trust for the taxable years 1955 to 1966 was as follows:

| Taxable year | Taxable income | Taxable year | Taxable income |
|---|---|---|---|
| 1955 | $35,740.98 | 1961 | $30,492.00 |
| 1956 | 32,887.80 | 1962 | 29,403.00 |
| 1957 | 32,447.58 | 1963 | 44,739.98 |
| 1958 | 27,578.10 | 1964 | 56,231.74 |
| 1959 | 27,827.00 | 1965 | 63,223.56 |
| 1960 | 29,419.50 | 1966 | 67,860.01 |

For the purpose of determining her gross recovery in respect to the fee agreement of May 31, 1962, petitioner agreed with her attorneys that the value of the shares of Provident capital stock transferred pursuant to the settlement agreement of May 13, 1963, should be determined by reference to the estate tax value assigned by the Internal Revenue Service.

The Internal Revenue Service assigned an estate tax value of $535.00 per share to the capital stock of Provident. Consequently, petitioner paid $95,036.70 in legal fees pursuant to the fee agreement of May 31, 1962. Petitioner paid $52,500 during 1963 and 1964, $22,536.70 in 1965, and $20,000 in 1966.

OPINION

In this case, petitioner's father established an inter vivos trust for the benefit of the petitioner as part of a divorce settlement with petitioner's mother. In 1955, petitioner's father revoked the trust with the consent of petitioner's mother and created a second inter vivos trust for the benefit of the petitioner. In 1961, petitioner's father died leaving a will in which he established trusts of one-half his estate for his other children, but in which he specifically disinherited the petitioner.

Subsequently, petitioner instituted a probate action to challenge the validity of the will and commenced a suit in equity to compel specific performance of an alleged promise by petitioner's father to make a will treating petitioner equally with the two children of his second marriage. Both actions were terminated by agreement of the parties. In settlement of the equity suit, the executors of the estate of petitioner's father transferred 909 shares of Provident stock to the second trust which had previously been created for the benefit of the petitioner. The legal expenses herein in question were incurred in the assertion and settlement of these actions.

It was petitioner's original contention that the legal expenses in question were fully deductible under section 212[1] as ordinary and necessary expenses for the production of income. However, in view of the recent Supreme Court decisions in *Woodward* v. *Commissioner*, 397 U.S. 572 (1970), and *United States* v. *Hilton Hotels*, 397 U.S. 580 (1970), which broadly expanded the scope of the capitalization doctrine as applied to legal fees, petitioner presently concedes that the legal fees at issue in the instant case "represent expenses of acquiring property having a useful life to petitioner substantially beyond the taxable year(s)" in issue and that "Therefore these legal expenses are capital in nature (sec. 1.263(a)–2(a), Income Tax Regs.)[2] and not currently deductible under section 212."[3]

Consequently, the only question remaining before us is whether the petitioner is entitled to amortize the legal fees in issue over her life expectancy. Petitioner contends that these legal fees represent the acquisition cost of the life estate in the stock which she received in settlement of her quasi-specific performance action and that she is entitled to amortize such cost over her life expectancy under section 212 or section 167.

Respondent argues that under the rationale of *Lyeth* v. *Hoey*, 305 U.S. 188 (1938), the receipt by the petitioner of the life estate pursuant to the settlement of the quasi-specific performance action was equivalent to an acquisition by "gift, bequest, or inheritance." On this basis, he concludes that amortization of the legal fees in question is precluded by section 273.[4]

We find absolutely no merit in petitioner's view that the legal fees in question are amortizable under section 212. We have found no basis for this position in any statutory or case authority. Furthermore, petitioner has conceded that the legal expenses were capital in nature and not currently deductible under section 212. Being capital in nature, they are not deductible under section 212 in any form.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

[2] Sec. 1.263(a)–2. Examples of capital expenditures.

The following paragraphs of this section include examples of capital expenditures:

(a) The cost of acquisition, construction, or erection of buildings, machinery and equipment, furniture and fixtures, and similar property having a useful life substantially beyond the taxable year.

[3] SEC. 212. EXPENSES FOR PRODUCTION OF INCOME.

In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

(1) for the production or collection of income;

(2) for the management, conservation, or maintenance of property held for the production of income; or

(3) in connection with the determination, collection, or refund of any tax.

[4] SEC. 273. HOLDERS OF LIFE OR TERMINABLE INTEREST.

Amounts paid under the laws of a State, a Territory, the District of Columbia, a possession of the United States, or a foreign country as income to the holder of a life or terminable interest acquired by gift, bequest, or inheritance shall not be reduced or diminished by any deduction for shrinkage (by whatever name called) in the value of such interest due to the lapse of time.

Hence, we are left with only petitioner's amortization claim under section 167 and respondent's argument that the rationale of *Lyeth* v. *Hoey, supra,* prevents such amortization. In *Lyeth* v. *Hoey, supra,* the Supreme Court decided that when what is received by a compromise is part of that which is claimed, that which is received is of the same character for tax purposes as the claim which is compromised. On this basis, the Court held that since the taxpayer's claim in that case was based on his standing as an heir, the amounts he received in compromise of his claim came to him as an heir and had therefore been acquired by him through bequest, devise, or inheritance.

In this case, the petitioner acquired a life estate in the income from stock which was placed in a trust pursuant to a settlement of her quasi-specific performance action against the estate. She asserted this claim as a third-party beneficiary of a contract between her father and mother to make a will. Any interest she acquired as a result of the settlement of this claim flowed from her standing as a third-party beneficiary and not from her standing as an heir, devisee, donee, or legatee. In these circumstances, the rationale of *Lyeth* v. *Hoey, supra,* is not applicable and does not operate to render her life interest an interest "acquired by gift, bequest, or inheritance" within the meaning of section 273.

If the petitioner had been successful in obtaining the stock directly, the legal fees in question would have been capital costs of acquisition and added to the cost basis of the stock. *Garrett* v. *Crenshaw*, 196 F. 2d 185 (C.A. 4, 1952; *Helvering* v. *Stormfeltz*, 142 F. 2d 982 (C.A. 8, 1944); *Hutchings* v. *Burnet*, 58 F. 2d 514 (C.A. D.C., 1932), affirming 20 B.T.A. 1227 (1930); *Bliss* v. *United States*, 179 Ct. Cl. 353, 373 F. 2d 936 (1967); *Daniel S. W. Kelly*, 23 T.C. 682 (1955), affd. 228 F. 2d 512 (C.A. 7, 1956). Legal fees are no less a cost of acquisition where that which is acquired is a life estate; and, in our opinion, the legal fees in question were incurred as the cost of acquiring a life estate in the income from the stock transferred to the trust. Cf. *Allen M. Early*, 52 T.C. 560, 566 (1969), reversed on other grounds 445 F. 2d 166 (C.A. 5, 1971). See also *Jones' Estate* v. *Commissioner*, 127 F. 2d 231 (C.A. 5, 1942); and *Pennroad Corporation*, 21 T.C. 1087 (1954).

It is well settled that a taxpayer who acquires a life estate may amortize the cost of his acquisition over the period of the life expectancy of the beneficiary (in this case the petitioner) by ratable annual deductions. *Commissioner* v. *Fry*, 283 F. 2d 869 (C.A. 6, 1960); *Bell* v. *Harrison*, 212 F. 2d 253 (C.A. 7, 1954); *Gist* v. *United States*, 296 F. Supp. 526 (1969), affd. 423 F. 2d 1118 (C.A. 9, 1970); *Estate of Daisy F. Christ*, 54 T.C. 493 (1970); *May T. Hrobon*, 41 T.C. 476, 503 (1964); and *Elmer J. Keitel*, 15 B.T.A. 903 (1929).

Since petitioner's life estate constitutes property held for the production of income, its amortizable cost is deductible pursuant to section 167(a)(2).[5] *Commissioner* v. *Siegel*, 250 F. 2d 339 (C.A. 9, 1957), affirming 26 T.C. 743; and *Estate* of *Daisy F. Christ, supra.*

Respondent asserts that only three-fourths of the legal expenses are properly amortizable. Respondent points out that while 909 shares of Provident stock were to be transferred to the preexisting trust for the benefit of the petitioner, the settlement agreement gave the petition an option to receive in cash, free of any trust, an amount not to exceed 227 shares of stock multiplied by $275 per share. On this basis, he concludes that since only 682 shares of stock were required to be placed in trust, only three-fourths (682/909) of the legal fees were paid directly for the acquisition of a life estate and therefore subject to amortization. We disagree with the respondent.

Under the terms of the agreement, the entire 909 shares of Provident stock were to be transferred to the trust unless the petitioner exercised her option to receive the value of one-fourth of the shares in cash. She has not exercised the option, and the entire 909 shares were transferred to the trust. Having elected to have all the stock placed in the trust, petitioner acquired a life estate in the income derived from the trust, including the income derived from all the shares transferred to the trust pursuant to the settlement agreement. Therefore, the legal fees attributable to those shares subject to the option were part of the cost of acquiring a life estate in the total number of shares transferred to the trust and as such are subject to amortization over the life expectancy of the petitioner.

*Decision will be entered under Rule 50.*

---

[5] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

* * * * * * *

(2) of property held for the production of income.