HENRY W. SOHOSKY AND DONNA SOHOSKY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JOHN J. SOHOSKY, JR., AND M. JEAN SOHOSKY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4162–70, 4239–70. Filed December 20, 1971.

*Max H. Myers* and *L. Thomas Elliston*, for the petitioners.
*Larry K. Hercules*, for the respondent.

FORRESTER, *Judge:* Respondent has determined income tax deficiencies in docket No. 4162–70 of $2,521.45 and $2,775.15 for the calendar years 1967 and 1968, respectively. He has also determined income tax deficiencies in docket No. 4239–70 of $2,651.63, $2,881.04, and $3,024.27 for the calendar years 1966, 1967, and 1968, respectively.

The issue presented for our decision is whether petitioners John J. Sohosky, Jr., and Henry Sohosky purchased a wasting interest in certain stock of a closely held corporation so that petitioners would be entitled to deductions in respect of the gradual exhaustion of that interest.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and exhibits attached thereto are incorporated herein by this reference.

Petitioners in docket No. 4162–70, Henry W. Sohosky (hereinafter referred to as Henry) and Donna Sohosky, are husband and wife and were residents of Joplin, Mo., at the time of the filing of their petition herein. They filed joint Federal income tax returns for the calendar years 1967 and 1968 with the district director of internal revenue in St. Louis, Mo.

Petitioners in docket No. 4239–70, John J. Sohosky, Jr. (hereinafter referred to as John, Jr.), and M. Jean Sohosky, are husband and wife and were residents of Joplin, Mo., at the time of the filing of

404

their petition herein. They filed joint Federal income tax returns for the calendar years 1966, 1967, and 1968, with the district director of internal revenue in St. Louis, Mo.

Lewis Motor Supply Co. (a closely held corporation hereinafter referred to as the company) was founded by John J. Sohosky, Sr. (hereinafter referred to as John, Sr.), and three other individuals. Eventually all of the company's stock devolved upon John, Sr. The company operates a wholesale and retail automotive parts business which redistributes parts to small jobbers and also has its own machine shop.

When John, Sr., died testate on November 26, 1963, he was survived by his wife, Eva Sohosky (hereinafter referred to as Eva), and four children—John, Jr., Henry, Louis O. Sohosky (hereinafter referred to as Louis), and Laura Virginia Emrich. John, Jr., and Henry are petitioners herein. At his death John, Sr., owned 1,498 of the 1,500 outstanding shares of the company's common stock.

John, Sr.'s last will and testament was duly filed for probate with the Probate Court of Jasper County, Mo. by John, Jr., as executor. After making provision for personal debts and funeral expenses, the will read as follows:

I give and bequeath all of the rest, residue and remainder of my estate, whether real, personal or mixed and wherever it may be situated to my wife, Eva Sohosky, for and during her life, with full power to sell or dispose of all or any part thereof as she may see fit during her lifetime. After her death, or if she should die first or concurrently with me, all of my estate, or all that may remain of my said estate, whether real, personal or mixed or wherever it may be situated, shall be divided equally among my four children, John J. Sohosky, Jr., Louis O. Sohosky, Henry W. Sohosky and Laura Virginia Emrich, per stirpes and not per capita.

On October 29, 1964, the Probate Court filed and approved a document entitled "Final Settlement Approved, Finding and Order of Distribution (Testate Estate) "which provided in relevant part as follows:

The court finds and adjudges that the decedent, being at the time a resident of Jasper County, in the state of Missouri, died on the 22nd [1] day of November, 1963, at Joplin, Missouri, leaving a last will and testament which was admitted to probate by this court on the 3rd day of December, 1964, that all legacies thereunder, other than those hereinafter set forth, have been paid or satisfied and that the distributees of this estate and their respective interests therein, pursuant to the terms and provisions of said will, at said date of death, were as set forth below, and the court orders that the personal property

---

[1] Notwithstanding the probate court's finding, it has been stipulated by the parties that John, Sr., died on Nov. 26, 1963.

remaining in the hands of the execut_____ after satisfaction of any allowances and orders herein made be distributed as follows:

| Distributee | Article or paragraph of will | Interest of residuary distributee (all or fraction) | Property to be distributed [1] |
|---|---|---|---|
| Eva Sohosky, widow_____ | Second_____ | All_____ | 1498 shares of stock in Lewis Motor Supply Company, a Missouri Corporation |

[1] The personal property on hand to which each distributee is entitled should be specifically described, taking into consideration any partial distribution or allowances chargeable against the share of each distributee.

John, Jr., filed and signed, as executor of John, Sr.'s estate, a Federal estate tax return (dated October 15, 1964) with the Internal Revenue Service. The Internal Revenue Service questioned the correctness of this estate tax return, the disputed issues being the value of the company's stock and whether that stock (and the salary due John, Sr., at his death) qualified for a marital deduction under section 2056.[2] As a result John, Jr., hired legal counsel to represent the estate. In a document received by the Internal Revenue Service on September 9, 1966, John, Jr., as executor of John, Sr.'s estate, protested a proposed estate tax deficiency with respect to the disputed issues. John, Jr., personally signed the protest which stated in pertinent part as follows:

Construing the Will of John J. Sohosky under the Missouri law, and giving full effect to all the language used therein, it is clear that the testator's intention was to grant to his widow an unlimited power to appoint the entire residuary estate to herself, and that such power was exercisable by her alone and in all events, within the meaning of Section 2056(b)(5) of the Code.

At the time of trial John, Jr., was the company's president and had been with the company for 31 years, having started in the shipping department receiving goods and delivering merchandise to customers. At the time of trial Henry was the company's vice president and had been with the company since August 1941, having started as cleanup man in the shop.

Prior to John, Sr.'s death John, Sr., and John, Jr., had been actively involved in the company's management. At the time of trial John, Jr., and Henry were actively involved in the company's management. Prior to and for some time after John, Sr.'s death Louis was an employee of the company. Eva was never active in the business, although at times she was listed as an employee and did draw a salary.

After John, Sr.'s death, Louis, Henry, and John, Jr., had disputes among themselves in reaching business decisions. Consequently on

[2] Unless otherwise indicated all references are to the Internal Revenue Code of 1954.

January 26, 1965, Eva, Henry, John, Jr., and Louis entered into a contract which had the effect of removing Louis from participation in the company.

On April 1, 1965, Eva as "Seller" and Henry and John, Jr., as "Buyers" executed a contract, pertinent excerpts of which follow:

On the 26th day of January, 1965, by a contract entered into by and between Eva Sohosky, Louis O. Sohosky, Henry W. Sohosky and John J. Sohosky, Jr., Louis O. Sohosky sold, assigned and conveyed to Henry W. Sohosky and John J. Sohosky, Jr. all of his interest as remainderman in the estate of his father, John J. Sohosky, in the common stock of the Lewis Motor Supply Company * * * for the sum of $20,000.00, which was paid to him in cash and his stock certificates endorsed and transferred to the purchasers.

At the time said contract was entered into the three sons above named and Eva Sohosky were in charge of the conduct of the business of the Lewis Motor Supply Company and there was a lack of harmony existing between them and differences of opinion as to the proper conduct of the business and it was the desire of all parties to eliminate the causes of disharmony. This resulted in an offer by Louis O. Sohosky to sell his present and prospective interest in the Lewis Motor Supply Company which was effectuated by the contract above described and his resignation as an employee and director of the company.

In order to equalize the inheritance of the four children and as an advancement to Louis O. Sohosky of his prospective inheritance from her estate and to compensate him for his loss of employment and to provide him with capital to engage in some other business, Eva Sohosky made her son, Louis O. Sohosky, a gift of $30,000.00. The $20,000.00 purchase price and the $30,000.00 gift were made from the proceeds of a loan of $50,000.00 made by the First National Bank of Joplin, Missouri to Eva Sohosky, Henry W. Sohosky and John J. Sohosky, Jr. represented by a note signed by them. Among themselves Henry W. Sohosky and John J. Sohosky, Jr. have agreed to pay this note without any contribution from their mother, Eva Sohosky. All of the stock of the corporation has been pledged as security for this loan.

The purpose and intention of this contract is to provide Henry W. Sohosky and John J. Sohosky, Jr. with protection for the $50,000.00 obligation which they have assumed; to make equitable and just provisions so that each son and daughter will share as near as possible in the estate of John J. Sohosky and in the Estate of Eva Sohosky; and to make suitable provision for the security of Eva Sohosky and to provide her with an adequate income for the remainder of her life.

It is therefore agreed as follows:

Eva Sohosky, the Seller, does hereby sell, set over, transfer and convey unto the Buyers above named her life estate and her power of disposal in all of the shares of common stock of the Lewis Motor Supply Company and agrees to transfer said stock to the Buyers by endorsement and transfer of all stock certificates now registered in her name.

Buyers agree to pay to Seller the sum of $60,000.00 as the full purchase price therefor to be represented by a promissory note executed by them payable ten years from date bearing interest at the rate of no per cent per annum. In the event of the death of Eva Sohosky said note shall become immediately due and payable.

The Seller agrees that she will make a bequest in her Last Will and Testament bequeathing to her daughter, Virginia Emrich, a $20,000.00 interest in

said promissory note and that she will bequeath the remaining interest therein which is unpaid at the time of her death to her two sons, John J. Sohosky, Jr. and Henry W. Sohosky, share and share alike, but also providing that all amounts paid by them on said note and three-fifths of all amounts paid by them on the $50,000.00 note payable to the First National Bank of Joplin, Missouri, shall be repaid to them from her estate and she agrees to so provide in her Will.

Buyers agree and bind themselves that they will cause the Lewis Motor Supply Company to employ the Seller in her present capacity at the same remuneration of all kinds as is now being received by her unless Seller shall voluntarily agree to a reduction on her own initiative.

Buyers agree that upon delivery to them of the stock herein purchased by them that they will execute and deliver to the Seller an irrevocable proxy authorizing her to vote a majority of the outstanding stock of the corporation.

Major purposes of the April 1, 1965, agreement were to enable John, Jr., and Henry to gain control of the company and to provide Eva with an income for the rest of her life. After April 1, 1965, however, Eva, as holder of the proxy of a majority of the company's stock, still had control of the company. Therefore, on May 14, 1966, Eva, John, Jr., and Henry entered into a new agreement in order that John, Jr., and Henry could gain complete control of the company. This second contract which was executed by Eva as "Seller" and by John, Jr., and Henry as "Buyers," referred to the contract of April 1, 1965, and provided in part as follows:

Now THEREFORE it is agreed between the parties hereto as follows, to-wit:

1. That the contract above described dated April 1st, 1965 be and is hereby cancelled and terminated and in lieu thereof the parties have now entered into the following agreements.

2. The Seller agrees to sell and the Buyers agree to buy 1494 shares of the common, stock of the Lewis Motor Supply Company for the following consideration.

a. $75,000.00 to be represented by a non-interest bearing promissory note payable in weekly installments of $200.00 per week beginning January 1st, 1966 and continuing until the full amount has been paid.

b. The assumption of all remaining liability on a note in the original amount of $50,000.00 payable to the First National Bank of Joplin, Missouri dated January 26, 1965, which the parties agree has previously been done by the execution of a new note which Seller did not sign. The amount previously paid on said note by Buyers represent a part of the consideration for the purchase of said stock.

3. Seller agrees for the consideration herein set out to relinquish all rights retained by her relating to employment by the Lewis Motor Supply Company and to surrender all proxies giving her the right to vote a portion of the stock previously sold to the Buyers, which proxies have never been exercised by Seller, and which are hereby cancelled.

4 Seller's previous transfer and endorsement of the stock certificates previously held by her are hereby ratified and confirmed and the parties agree that the Buyers are the unconditional owners of said stock without restriction of any kind.

5. All other obligations or conditions contained in the original contract are hereby terminated, cancelled and rescinded by this agreement.

After May 14, 1966, Eva had no voting power in the company, was not employed by it, and was not a member of its board of directors.

On various dates the company's board of directors held meetings, the minutes of which were recorded. In particular, in a meeting held May 20, 1966, the minutes showed in part that:

Mr. John J. Sohosky, Jr. then announced that on the 14th day of May, 1966 a contract had been entered into between himself, Henry W. Sohosky and Eva Sohosky confirming their purchase of all of the shares of stock held by Eva Sohosky under a contract dated April 1, 1965, but changing the terms of the purchase, all as more particularly set out in said contract, and further announced that by the terms of the contract they had become the unconditional owners of the stock without restrictions of any kind and that all rights formerly retained by Eva Sohosky were, by the terms of said contract, surrendered.

OPINION

At the death of John, Sr., his estate included 1,498 shares of the company's stock. By his will he left his residuary estate, including this stock, to his wife, Eva, "for and during her life, with full power to sell *or* dispose of all or any part thereof *as she may see fit* during her lifetime." (Emphasis supplied.)

On April 1, 1965, Eva as "Seller" and John, Jr., and Henry as "Buyers" executed a contract in which Eva agreed to "sell, set over, transfer and convey unto the Buyers above named her life estate and her power of disposal in all of the shares of common stock of the Lewis Motor Supply Company." As part of the contract, John, Jr., and Henry agreed to (1) pay Eva a sum of money represented by a promissory note, (2) cause the company to employ Eva, and (3) execute and deliver to Eva an irrevocable proxy authorizing her to vote a majority of the company's stock.

As Eva retained a proxy to vote a majority of the stock, this first contract proved unsatisfactory for the purpose of enabling John, Jr., and Henry to gain complete control of the company. Consequently, on May 14, 1966, Eva as "Seller" and John, Jr., and Henry as "Buyers" entered into a second contract in which Eva agreed "to sell" and John Jr., and Henry agreed "to buy" 1,494 shares [3] of the company's common stock in exchange for certain enumerated consideration. As part of the bargain Eva agreed to surrender her proxy and to relinquish all rights she retained with respect to employment by the company. The

---

[3] The contracts of Apr. 1, 1965, and May 14, 1966, dealt only with the disposition of 1,494 of the company's shares. The record is silent as to the other 4 shares.

second contract also canceled and terminated the contract of April 1, 1965, providing, however, that:

Seller's previous transfer and endorsement of the stock certificates previously held by her are hereby ratified and confirmed and the parties agree that the Buyers are the unconditional owners of said stock without restriction of any kind.

Petitioners contend that what John, Jr., and Henry obtained under the contracts of April 1, 1965, and May 14, 1966, was no more than Eva's life interest in 1,494 shares of the company's common stock. Therefore, they claim that they were entitled to deductions for the exhaustion (measured by Eva's life expectancy) of that life interest even though they were remaindermen under the will.[4] See, e.g., *Bell v. Harrison*, 212 F. 2d 253 (C.A. 7, 1954); *Marianne Crocker Elrick*, 56 T.C. 903 (1971); *Estate of Daisy F. Christ*, 54 T.C. 493, 528 (1970), on appeal (C.A. 9, Jan. 11, 1971); *William N. Fry, Jr.*, 31 T.C. 522 (1958), affd. 283 F. 2d 869 (C.A. 6, 1960); *Floyd M. Shoemaker*, 16 B.T.A. 1145 (1929); *Elmer J. Keitel*, 15 B.T.A. 903 (1929); Rev. Rul. 62–132, 1962–2 C.B. 73.

Respondent, on the other hand, maintains that John, Jr., and Henry acquired "complete and absolute ownership in those shares of stock under Eva's power to dispose." And, as a general rule, since its useful life is usually either not limited or too difficult to reasonably ascertain, the full interest represented by complete and absolute ownership of common stock is not a wasting asset for which a depreciation deduction may be allowed. Sec. 1.167(a)–3, Income Tax Regs.; see *Howard Construction, Inc.*, 43 T.C. 343, 357 (1964); cf. *Peter P. Risko*, 26 T.C. 485 (1956) (deduction allowed for exhaustion of partnership interest where length of remaining life known).

The ultimate determination we must make, then, is the extent of the interest which Eva was empowered to transfer under the will, for she could transfer no greater interest in the stock than she had been empowered to transfer. Consequently, if she did not receive the power to transfer the full right, title, and interest to the stock, respondent would be wrong in claiming that John, Jr., and Henry received com-

---

[4] The parties are in agreement that if John, Jr., and Henry purchased only a life interest, petitioners would be entitled to a deduction for the exhaustion of that life interest. Without denominating that deduction as one for amortization or depreciation and without determining whether it would be allowable under sec. 167, sec. 212, or some other section, we should note that there is some controversy concerning the nature of such a deduction. Compare *Allen M. Early*, 52 T.C. 560, 570–571 (1969) (Tannenwald, J., dissenting), revd. 445 F. 2d 166 (C.A. 5, 1971), certiorari applied for (July 26, 1971), with *Manufacturers Hanover Trust Co.* v. *Commissioner*, 431 F. 2d 664, 667, fn. 4 (C.A. 2, 1970), affirming a Memorandum Opinion of this Court. But, as our decision does not depend upon the use of one characterization or the other, we deem it unnecessary to consider the point further. See *Gulf Television Corp.*, 52 T.C. 1038, 1067 (1969) (Tannenwald, J., concurring); *KIRO, Inc.*, 51 T.C. 155, 170, fn. 12 (1968). In order not to add to the controversy, we shall refrain from using the terms depreciation and amortization and, instead, will refer to the deduction as one for the exhaustion of a life interest.

plete and absolute ownership of the stock. And, if John, Jr., and Henry received less than absolute and complete ownership of the stock, they might be entitled to deductions for the exhaustion of the interest they did receive.

In making this ultimate determination we must analyze the will in order to glean from it that standard with reference to which all wills should be interpreted, the testator's intent. See Mo. Ann. Stat., sec. 474.430 (1956).

Petitioners argue to the effect that all Eva inherited was a life estate with a disposal power, exercisable only in exchange for adequate consideration. We note, however, that petitioners have not proved that the transfer of the stock by Eva to John, Jr., and Henry pursuant to the contracts of April 1, 1965, and May 14, 1966, was not for an adequate and full consideration for the entire interest in the stock.[5] But we believe that even if the transfer was for less than an adequate and full consideration such transfer was authorized by the will and required no accounting by Eva to the remaindermen listed in the will.

Petitioners cite *Bollenger v. Bray*, 411 S.W. 2d 65 (1967); *Graham v. Stroh*, 342 Mo. 686, 117 S.W. 2d 258 (1938); *Presbyterian Orphanage of Missouri v. Fitterling*, 342 Mo. 299, 114 S.W. 2d 1004 (1938); *Cook v. Higgins*, 290 Mo. 402, 235 S.W. 807 (1921); *Priest v. McFarland*, 262 Mo. 229, 171 S.W. 62 (1914); *Tallent v. Fitzpatrick*, 253 Mo. 10, 161 S.W. 689 (1913); *Burnet v. Burnet*, 244 Mo. 491, 148 S.W. 872 (1912); and *Garland v. Smith*, 164 Mo. 1, 64 S.W. 188 (1901), in support of their view that Eva was accountable to the remaindermen. We believe those cases to be distinguishable.[6]

In *Garland v. Smith*, it was held that the donee of a "power to sell, mortgage, incumber, lease, or otherwise dispose of" certain property was not authorized by such language to make a gift of that property for the reason (among others) that a general, sweeping clause such as "or otherwise dispose of" should be limited to actions of the same nature as those preceding it. In the present case, however, the grant of the power to "dispose" was preceded only by a grant of a power

---

[5] The total consideration finally agreed upon in the contract of May 14, 1966, was $125,000 ($75,000 represented by a promissory note payable in weekly installments plus $50,000 in respect of the assumption by John, Jr., and Henry of Eva's liability on a note). Certain testimony of John, Jr., and Henry tended to indicate that the entire interest in the stock was worth substantially more than $125,000 on May 14, 1966. Relying on that testimony petitioners calculate a value of $225,000 for the entire interest in the stock. However, John, Jr., as executor of John Sr.'s estate, declared in the estate tax return that the value of the 1,498 shares in John, Sr.'s estate at John, Sr.'s death was $112,350. In comparing these two bits of evidence we find that we cannot rely upon the self-serving testimony of John, Jr., and Henry to reach the conclusion that the value of the stock may have doubled in the period between John, Sr.'s death in 1963 and the execution of the contract of May 14, 1966.

[6] The case of *Priest v. McFarland*, 262 Mo. 229, 171 S.W. 62 (1914), in fact provides support for respondent's position.

"to sell" and was succeeded by the phrase "as she may see fit during her lifetime." The latter phrase serves to emphasize that Eva's power to dispose was not restricted or limited to a power to dispose for an adequate and full consideration. *Garland* v. *Smith* should be contrasted with the later case of *Priest* v. *McFarland*, which though cited by petitioners to buttress their position, instead provides support for respondent. In *Priest* v. *McFarland* the Supreme Court of Missouri held that where a life tenant had the power to sell and dispose of the testator's property "absolutely and at her own discretion and with full power to give a good and perfect title upon the sale or other disposition" of such property, it was immaterial to the efficacy of a conveyance to determine whether the life tenant had gotten a full price for the property conveyed. In all but two of the remaining cited cases the powers given to the life tenants were powers to sell *and* convey, sell *and* dispose, or sell, grant, convey, *and* deliver, i.e., powers in the conjunctive and *not* in the disjunctive as in the instant case.[7] In addition, in most of the cases the implications from other clauses in the wills or from extrinsic evidence made it clear that the testators did not intend to bestow powers of disposal exercisable for less than a valuable consideration.

Much closer to the present fact situation is *Geyer* v. *Bookwalter*, 193 F. Supp. 57 (W.D. Mo. 1961), where, with respect to the testator's "home place," the testator's widow had "good and full right to sell and convey fee simple title thereto, with such easements as are appurtenant, and not account for the proceeds thereof" and if she had not sold the home place by her death, the title thereto would pass to the testator's children. The court stated that the testator's widow had the power not only to sell the home place but to dispose of it by gift.

But in any event we must remember that: "By reason of the infinite variety of expression employed in wills, precedents are of less value in their construction than in many other fields of inquiry." *Housman* v. *Lewellen*, 362 Mo. 759, 763, 244 S.W. 2d 21, 23 (1951). Here, John, Sr., left his residuary estate to Eva "for and during her life, with *full* power to sell *or* dispose of all or any part thereof *as she may see fit* during her lifetime." (Emphasis supplied.) We believe that the emphasized language reveals John, Sr.'s intent to bestow upon Eva the power to dispose, during her lifetime, of as much of an interest in the elements of his residuary estate as he himself had. Such power would necessarily include the power to dispose of the

---

[7] In *Graham* v. *Stroh*, 342 Mo. 686, 117 S.W. 2d 258 (1938), the powers given to the life tenant were powers to "sell and convey or exchange." The granting of an additional power to "exchange" clearly contemplates an exchange for a valuable consideration. *Burnet* v. *Burnet*, 244 Mo. 491, 148 S.W. 872 (1912), is of only general relevance to our interpretation of John, Sr.'s will.

stock during her lifetime for less than an adequate and full consideration and we so hold.[8]

Finally, we note that the interest that Eva conveyed by either the contract of April 1, 1965, or the contract of May 14, 1966, was not in the nature of a wasting asset for which deductions for gradual exhaustion could be allowed. Certainly by the terms of the contract of May 14, 1966, John, Jr., and Henry became the unconditional owners of the stock.[9] And while Eva retained from April 1, 1965, to May 14, 1966, a proxy to vote a majority of the company's stock, this condition did not cause the expected useful life of the interest that remained to John, Jr., and Henry to become any more limited or any less unascertainable. Therefore, petitioners must be denied the deductions they claim.

*Decisions will be entered for the respondent.*

---

[8] In reaching this decision we have not relied upon either John, Jr.'s protest (as executor of John, Sr.'s estate) that Eva had "an unlimited power to appoint the entire residuary estate to herself" or the Jasper County Probate Court's order that all of the interest in the stock in John, Sr.'s estate be distributed to Eva. Cf. *Commissioner* v. *Estate of Bosch,* 387 U.S. 456 (1967).

[9] It was also John, Jr.'s belief as divulged at the company's directors meeting of May 20, 1966, that he and Henry had become the unconditional owners of the stock.