EVERETT J. GORDON AND MARIAN K. GORDON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 28805–82.     Filed August 20, 1985.

*Louis H. Diamond, Wayne K. Johnson, William S. Oshinsky,* and *Peter Lipresti,* for the petitioners.
*Carolyn A. Boyer,* for the respondent.

TANNENWALD, *Judge*: Respondent determined deficiencies in petitioners' Federal income taxes for taxable years 1976, 1977, and 1978 of $4,852, $7,903, and $17,296.50, respectively. After concessions by both parties concerning petitioners' distributive share of certain partnership losses, the sole issue for decision is whether respondent properly denied petitioners' amortization deductions with respect to the purported acquisition by petitioner Everett J. Gordon (Dr. Gordon) of income interests in municipal bonds purchased pursuant to joint purchase agreements entered into by Dr. Gordon and certain trusts.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. This reference incorporates the stipulation of facts and attached exhibits. At the time they filed their petition in this case, petitioners resided in Deerfield Beach, Florida. Petitioners filed joint Federal income tax returns for 1976, 1977, and 1978.

Dr. Gordon was born on July 23, 1914. Petitioner Marian K. Gordon (Mrs. Gordon) was born on November 23, 1926. On October 3, 1960, Dr. Gordon executed an agreement that established a trust for the benefit of petitioners' only three children—Solvin W., Stuart L., and Elissa A. Gordon. The agreement named David S. Gordon, Dr. Gordon's brother, as trustee, and provided for termination of the trust and reversion to Dr. Gordon as grantor on November 30, 1970.

On April 19, 1972, after termination of the October 3, 1960, trust, Dr. Gordon, as settlor, and Mrs. Gordon, as trustee, executed an agreement establishing an irrevocable trust (the family trust) to succeed the October 3, 1960, trust. The trust agreement grants to the trustee "full and complete power in the management and control of the Trust property," but the

trustee is given no power "to purchase, exchange, or otherwise deal with or dispose of all or any part of the corpus or income of the Trust for less than an adequate consideration in money or money's worth." The agreement specifies a successor trustee in the event Mrs. Gordon fails or ceases to serve, and provides that "In no event shall the grantor of any funds to this Trust be a TRUSTEE hereunder." Stating that the family trust was created "with the purpose and intent permanently and absolutely to divest the SETTLOR of any and all beneficial interest in and over all possession, dominion, and control of the said property," the trust agreement provides that it shall not be construed "as authorizing or empowering the SETTLOR, either with or without action of the TRUSTEE, to reinvest themselves [sic], expressly or by operation of law, of the beneficial title to all or any part of the Trust property or its revenue." The settlor is given "no power, either alone or in conjunction with any other person or persons, * * * to alter, amend, modify, revoke, or terminate this instrument in any way except to make additions to the corpus."

By letter dated November 28, 1972, Louis H. Diamond and Wayne K. Johnson, both of the law firm of Danzansky, Dickey, Tydings, Quint & Gordon, advised Dr. Gordon as follows:

Everett J. Gordon, M.D.
President
EVERETT J. GORDON, M.D., CHARTERED
9401 Indian Head Highway
Oxon Hill, Maryland 20022

Dear Everett:
    As we discussed with you on November 1, 1972, we believe that it is possible to develop a format for acquisition of an interest in income-producing property that will provide to an investor a substantial tax-free cash flow during his life, a proportionate tax deduction over his life expectancy of his cost of acquisition, and a reduction of his taxable estate. This arrangement is very well adapted to use by an incorporated professional with a qualified pension or profit sharing trust. The essence of the transaction is a joint purchase by the professional and the qualified trust of, respectively, a life or income interest, and a remainder interest in a portfolio of tax exempt state or municipal bonds.
    Under such an arrangement, the professional would purchase at fair value a life estate in the bond portfolio and the trust would purchase the remainder interest. Assuming a bond portfolio of $100,000, for example, and a male professional, age 55, the Life Tenant's cost would be approximately $61,780, and the cost to the qualified trust would be approximately $38,220.

Assuming a 5 percent bond coupon, the Life Tenant's income would be $5,000 per year. The Life Tenant would also be entitled to deduct $6,000 per year as depreciation on his purchase life interest until he had fully recovered $61,780. If the professional lived beyond the actuarial assumption of 10.3 years, the $5,000 per year would still be received as tax-free interest, but there would be no more further depreciation deductions. To protect the trust and assure that its return on its investment would not fall below a 4 percent compounded rate, however, we would recommend that the terms of the agreement provide that the Life Tenant's interest is to terminate, in any event, after 25 years from date of execution of the agreement. If the Life Tenant were to die before the assumed 10.3 years, a loss deduction would be allowed for the amount of his unrecovered basis.

The tax advantages of this arrangement for the Life Tenant may be summarized as follows:

1. The interest received each year by the Life Tenant is exempt from federal income tax. The joint purchase agreement would be prepared to create a legal life estate in the Life Tenant. The interest received by the Life Tenant, like that received by the income beneficiary of a trust, will be entitled to tax exemption.

2. The Life Tenant receives each year the benefit of a deduction of a proportionate part of the cost of his interest. The Internal Revenue Service recognizes the cost of a purchased life estate as a depreciable asset with a useful life equal to the life expectancy of the Life Tenant. See Rev. Rul. 62–132, 1962–2 C.B. 72. In our opinion, a depreciation deduction will be allowed for such cost even though the income received by the Life Tenant is tax exempt. *Manufacturers Hanover Trust Co. v. Commissioner*, 431 F.2d 634 (2d Cir. 1970).

3. At the death of the Life Tenant, no portion of the bond portfolio will be included in his gross estate.

The qualified trust as remainderman is not subject to income tax and would derive no advantage from the receipt of tax exempt interest. Upon termination of the Life Tenant's interest, the logical step would therefore be for the qualified trust to sell the property and to invest the proceeds in higher yielding securities or other investments.

If you are interested in pursuing this matter, we would be glad to prepare the necessary documents for execution by you and by the qualified trust.

Best regards.

Sincerely,

LOUIS H. DIAMOND

(S)Wayne K. Johnson
WAYNE K. JOHNSON
(For the Firm)

As of May 26, 1972, the value of the corpus of the family trust, consisting of common stock holdings, was $45,261.38. In

early 1973, Dr. Gordon contemplated implementing the transaction detailed in the letter, and, because there was at that time either no or insufficient cash in the family trust, Dr. Gordon turned to the Everett J. Gordon, Chartered Pension Trust (the pension trust) as his investment vehicle. Dr. Gordon never contemplated either selling the stock holdings of the family trust to buy the bonds or engaging in the transaction with an outside party. The pension trust had been established in 1969 for the benefit of Dr. Gordon's employees.[1] On January 22, 1973, Mr. Johnson wrote to Harvey R. Hale, an investment adviser at Ferris & Co., the investment firm used by petitioners from 1949, reflecting Dr. Gordon's intention to purchase $100,000 in bonds under a joint purchase agreement with the pension trust. Mr. Hale, by letter of February 2, 1973, recommended bonds for purchase to Mr. Johnson; aside from such recommendations of specific bonds, Ferris & Co. had nothing to do with the development of the investment strategy at issue herein.

On February 12, 1973, Dr. Gordon, individually, entered into a joint purchase agreement with himself as trustee of the pension trust providing as follows:

### JOINT PURCHASE AGREEMENT

For their mutual economic advantage, the undersigned, EVERETT J. GORDON, M.D. ("Life Tenant"), and EVERETT J. GORDON, M.D., CHARTERED, MONEY-PURCHASE PENSION TRUST ("Remainderman"), agree to contribute in proportion to their actuarial interests the amounts necessary to purchase municipal bonds in the principal amount of ONE HUNDRED THOUSAND ($100,000.00) DOLLARS ("the Corpus") from FERRIS & COMPANY, INCORPORATED, at a total price not to exceed ONE HUNDRED TEN THOUSAND ($110,000.00) DOLLARS. The contribution percentages of each of the parties are specified above their signatures at the foot of this Agreement.

It is agreed by and between the parties that the Life Tenant shall be entitled to receive the full benefit of any income derived from the Corpus purchased under this Agreement from the later of the date of its acquisition or the date of this Agreement, until the earlier of the day preceding the date of his death or the twenty-fifth (25th) anniversary of the execution of this Agreement. The Life Tenant shall, correspondingly, bear all expenses attributable to his interest in the Corpus. The entitlements and the

---

[1]The trust agreement as to the pension trust does not appear in the record. The pension *plan*, which refers to a "related trust," appears as Exhibit 98-CT.

obligations of the parties shall be determined in accordance with the Revised Uniform Principal and Income Act (Ann. Code of Maryland, Art. 75B §12).

Upon the death of the Life Tenant, all of his right, title and interest shall pass to and immediately vest in the Remainderman. The Remainderman shall thereupon be entitled to take title to the Corpus in its own name and to hold, manage, and deal with the property as its own without restriction.

During the term of this Agreement, title to any property acquired as Corpus shall be taken in the name of

> Everett J. Gordon, M.D.,
> as Life Tenant under Joint
> Purchase Agreement of
> February 12, 1973.

Executed in triplicate this 12th day of February, 1973.

EVERETT J. GORDON, M.D.
(Life Tenant)                    Contribution percentage: 57.778

                                 (S)   Everett J. Gordon, M.D.
_____                  _____
as to Everett J.                 EVERETT J. GORDON, M.D.
  Gordon, M.D.

EVERETT J. GORDON, M.D.,
CHARTERED, PENSION TRUST
(Remainderman)                   Contribution percentage: 42:222

                                 (S)   Everett J. Gordon, M.D., Trustee
_____                  _____
as to Everett J.                 EVERETT J. GORDON, M.D., Trustee
  Gordon, M.D.,
  Trustee

The percentages were taken from section 20.2031–10(f), table A(1), Estate Tax Regs.[2]

Pursuant to this agreement, the following bonds were purchased:

---

[2]We note that the regulation actually requires use of the "age" in Table A(1) "nearest to the actual age" of the measuring life. Sec. 20.2031–10(d), Estate Tax Regs. Thus, the proper factor for Dr. Gordon, who reached 58 on July 23, 1972, would appear to be .56417. Respondent, however, does not challenge the percentages used by petitioner; consequently, for purposes of this proceeding, we will assume that they are correct.

| Bonds | Cost[3] | Remainder portion | Life portion |
|---|---|---|---|
| Los Angeles Dept. of Water & Power, 5.2 percent, maturity 1-1-10 | | | |
| Maryland Bridge & Tunnel Revenue, 5.2 percent, maturity 10-1-08 | $76,366.12 | $31,771.00 | $44,595.12 |
| New York Port of New York, 5.375 percent maturity 11-1-06 | | | |
| Nebraska Omaha Public Power District, 5.375 percent, maturity 2-1-06 | 25,241.46 | 10,608.59 | 14,632.87 |

The statement of account by Ferris & Co. for "Everett J. Gordon MD—Life Tenant Under Jt Purchase Agreement of 2-12-73" reflects credits for each of the four components of cost shown above. Dr. Gordon and the pension trust issued. checks to Ferris & Co. for the amounts representing the portions of the cost allocable to the income and remainder interests, respectively.

A savings account for the family trust was opened on July 9, 1974, at National Permanent Federal Savings & Loan Association (National Permanent) with a deposit representing funds transferred from an individual account in Mrs. Gordon's name at National Permanent. Thereafter, cash deposits were made to the family trust account of investment income of the children's various trusts, family trust investment income, and funds derived from Dr. Gordon. The latter constituted checks payable to Dr. Gordon and deposited by Mrs. Gordon in the family trust account when she concluded that the funds were not needed for family purposes. The amounts of these checks are attributable to Dr. Gordon.

On July 10, 1974, Dr. Gordon and Mrs. Gordon, as trustee of the family trust, entered into a joint purchase agreement

---

[3]The "cost" figures stipulated to by the parties appear to include accrued interest, which was paid by the "life tenant." Thus, Dr. Gordon, individually, was to pay 57.778 percent of the principal amount of the bonds plus all of the accrued interest thereon. This calculation method was used for all of the bond purchases at issue herein.

identical to the February 12, 1973, agreement with the pension trust except that there was no 25-year limit on Dr. Gordon's income interest, the bonds were to be in the principal amount of $25,000, and the contribution percentages for Dr. and Mrs. Gordon were, pursuant to section 20.2031–10(f), table A(1), Estate Tax Regs., 56.417 percent and 43.583 percent, respectively. Pursuant to this agreement, the following bonds were purchased—

| Bonds | Cost | Remainder portion | Life portion |
|---|---|---|---|
| Pennsylvania State Highway, 6.6 percent, maturity 12–15–97 | $25,114.58 | $10,943.69 | $14,170.89 |

Payment of these bonds was reflected by a single credit on the Ferris & Co. statement of account, rather than in the manner of every other joint purchase transaction at issue herein, i.e., two separate credits—one for the portion allocable to the remainder interest and the other for the portion allocable to the income interest. The bond purchase pursuant to this agreement was completed by the end of July 1974.[4]

During 1974, a total of $14,503.07 was deposited into the savings account, excluding interest. The only withdrawals from the family trust's savings account in 1974 were in the amounts of $8,340.29, on July 9, and $4,993.38, on October 3. During 1975, $6,458.62 was deposited into the family trust's account, excluding interest, and $3,821.72 was withdrawn.

On July 16, 1976, Dr. Gordon and Mrs. Gordon, as trustee of the family trust, entered into a joint purchase agreement identical to the July 10, 1974, agreement, except that the bonds were to be in the principal amount of $100,000, and the contribution percentages for Dr. and Mrs. Gordon were, pursuant to section 20.2031–10(f), table A(1), Estate Tax Regs., 52.321 percent and 47.679 percent, respectively. Pursuant to this agreement, the following bonds were purchased—

---

[4]The record contains no checks reflecting payment for either of the allocable interests. It is clear that the family trust had insufficient cash funds to pay for its allocable share of the total cost. We think it reasonable, then, to infer that Dr. Gordon paid personally for the entire cost of the bonds. At least petitioners, who have the burden of proof (see Rule 142(a), Tax Court Rules of Practice and Procedure), have not shown otherwise.

| Bonds | Cost | Remainder portion | Life portion |
|---|---|---|---|
| St. Paul, Minnesota, 6.0 percent maturity 2–1–93 | $24,875.33 | $11,860.31 | $13,015.02 |
| San Antonio, Texas, 6.0 percent, maturity 2–1–94 | 24,803.58 | 11,826.10 | 12,977.48 |
| Colorado Springs Utilities, 6.2 percent maturity 11–15–98 | 25,094.72 | 11,964.91 | 13,129.81 |
| Nebraska Public Power Electric, 6.25 percent, maturity 1–1–91 | 25,043.40 | 11,940.44 | 13,102.96 |

Dr. Gordon issued checks on his office account to Ferris & Co. for the amounts representing the portion of the cost allocable to the income interests. The amounts representing the portion of the cost allocable to the remainder interests were paid by bank checks payable to Mrs. Gordon, as trustee, for withdrawal of funds from the Family Trust's savings account, and endorsed to Ferris & Co. On the Ferris & Co. statement of account, the amounts representing the portions of the cost of the July 16, 1976, purchases allocable to the income interests and the remainder interests were credited separately but identified merely as "DEP CAPITAL ADDITION."

During 1976, a total of $95,043.94, excluding interest and a refund from Ferris & Co. of an overpayment, was deposited in the family trust's account. This amount included three cash gifts to the family trust by Dr. Gordon totaling $32,775, which amount was shown on petitioners' gift tax returns as gifts directly to petitioners' three children for the quarter ending September 30, 1976. The maximum amount available for deposit into the family trust account during 1976 attributable to family trust investments and the various trust interests of petitioners' three children was $16,903.30. The remaining $45,365.64, attributable to Dr. Gordon (see *supra* p. 315), was not reported on gift tax returns filed by petitioners for 1976. Also during 1976, other than a $3,727.95 withdrawal from the family trust's account on February 6, all the withdrawals from

the account were for the 1976 bond purchases. After the bond purchases pursuant to the July 16, 1976, agreement were completed, the balance of the family trust's account was $1,332.81.

On January 31, 1977, Dr. Gordon and Mrs. Gordon, as trustee of the family trust, entered into a joint purchase agreement identical to that of July 16, 1976, except that the contribution percentages for Dr. and Mrs. Gordon were, pursuant to section 20.2031–10(f), table A(1), Estate Tax Regs., 50.954 percent and 49.046 percent, respectively. Pursuant to this agreement, the following bonds were purchased—

| Bonds | Cost | Remainder portion | Life portion |
|---|---|---|---|
| Baltimore County, 5.4 percent, maturity 4–1–97 | $24,912.00 | $12,218.34 | $12,693.66 |
| Memphis, Tennessee, 5.2 percent, maturity 5–1–94 | 25,050.56 | 12,286.30 | 12,764.26 |
| Washington Sub. San. Comm., 5.25 percent, maturity 2–1–95 | 24,684.52 | 12,106.77 | 12,577.75 |
| Omaha Pub. Pwr. District, 5.7 percent, maturity 2–1–95 | 25,153.54 | 12,336.81 | 12,816.73 |

Dr. Gordon issued checks on his office account to Ferris & Co. for the amounts representing the portion of the cost allocable to the income interests. The amounts representing the portion of the cost allocable to the remainder interests were paid by bank checks payable to Mrs. Gordon, as trustee, for withdrawal of funds from the family trust's savings account and endorsed to Ferris & Co. On the Ferris & Co. statement of account, the amounts representing payment for the portions of the cost of the January 31, 1977, purchases allocable to the income interests and the remainder interests were credited separately but identified merely as "DEP CAPITAL ADDITION." After these bond purchases were completed, the balance of the family trust's savings account was $3,066.44.

On July 7, 1977, Dr. Gordon and Mrs. Gordon, as trustee of the family trust, entered into a joint purchase agreement identical to that of January 31, 1977. Pursuant to this agreement, the following bonds were purchased—

| Bonds | Cost | Remainder portion | Life portion |
|---|---|---|---|
| Pennsylvania Commonwealth, 5.5 percent, maturity 2–1–97 | $24,337.93 | $11,936.78 | $12,401.15 |
| Virginia Hampton Rds. Sanit., 5.8 percent, maturity 7–1–05 | 25,108.75 | 12,314.84 | 12,793.91 |
| Washington Pub. Pwr. Supply, 5.7 percent, maturity 7–1–09 | 25,106.88 | 12,313.92 | 12,792.96 |
| Pennsylvania Allegheny Co., 5.7 percent, maturity 8–1–07 | 25,158.34 | 12,339.16 | 12,819.18 |

Dr. Gordon issued checks on his office account to Ferris & Co. for the amounts representing the portion of the cost allocable to the income interests. The amounts representing the portion of the cost allocable to the remainder interests were paid by bank checks payable to Mrs. Gordon, as trustee, for withdrawal of funds from the family trust's savings account and endorsed to Ferris & Co. On the Ferris & Co. statement of account, the amounts representing payment for the portions of the cost of the July 7, 1977, purchases allocable to the income interests and remainder interests appear as separate credits but were identified merely as "DEP CAPITAL ADDITION."

During 1977, excluding interest, a total of $78,458.89 was deposited in the family trust's savings account. Included were a total of $31,313.75 in checks, drawn on Dr. Gordon's office account and his professional corporation's office account, deposited directly into the family trust's savings account. The maximum amount available for deposit into this account during 1977 attributable to family trust investments and the various trust interests of petitioners' three children was

$20,359.15. The remaining $26,785.99, attributable to Dr. Gordon (see *supra* p. 10), as well as the $31,313.75 deposited by or on behalf of Dr. Gordon, was not reported on gift tax returns filed by petitioners during 1977. The only withdrawals in 1977 from the family trust savings account were for payments pursuant to the joint purchase agreements of January 31, 1977, and July 7, 1977. After completion of these purchases, the family trust's savings account balance was $1,055.67.

On February 3, 1978, Dr. Gordon and Mrs. Gordon, as trustee of the family trust, entered into a joint purchase agreement identical to those of January 31, 1977, and July 7, 1977. Pursuant to this agreement, the following bonds were purchased—

| Bonds | Cost | Remainder portion | Life portion |
|---|---|---|---|
| Maryland State Comm. Dev. Adm., 6.5 percent, maturity 1–1–08 | $20,021.67 | $9,819.83 | $10,201.84 |
| Arizona Salt River Project, 6.2 percent, maturity 1–1–18 | 20,189.56 | 9,902.17 | 10,287.39 |
| Louisville Water Rev., 6.0 percent, maturity 11–15–05 | 20,100.00 | 9,858.25 | 10,241.75 |
| South Carolina Pub. Service Auth., 5.875 percent, maturity 7–1–18 | 19,432.64 | 9,530.93 | 9,901.71 |
| Wash. Pub. Pwr. Supply, 6.8 percent, maturity 7–1–10 | 19,525.00 | 9,602.17 | 9,975.72 |

Dr. Gordon issued checks on his office account to Ferris & Co. for the amounts representing the portion of the cost allocable to the income interests. The amounts representing the portion of the cost allocable to the remainder interests were paid by bank checks payable to Mrs. Gordon, as trustee, for withdrawal of funds from the family trust's savings account and

endorsed to Ferris & Co. On the Ferris & Co. statement of account, the amounts representing payment for the portions of the cost of the February 3, 1978, purchases allocable to the income interests and remainder interests were credited separately but identified merely as "DEP CAPITAL ADDITION."

During 1978, excluding interest, a total of $91,431.61 was deposited to the family trust savings account; $41,401.52 of this amount was deposited before the purchases pursuant to the February 3, 1978, agreement were completed. This amount included a deposit of cash amounts distributed to Mrs. Gordon pursuant to the settlement in 1978 of Mrs. Gordon's mother's estate. The maximum amount available for deposit to this account during 1978 attributable to family trust investments and the various trust interests of petitioners' three children was $35,045.23. The remaining $56,386.38 (including the distribution to Mrs. Gordon from her mother's estate), attributable to petitioners (see *supra* pp. 315–316), was not reported on gift tax returns filed by petitioners for 1978. Petitioners did report cash gifts directly to the children totaling $18,000. The only withdrawals during 1978 other than those pursuant to the purchase agreement dated February 3, 1978, were a $20,000 transfer to a 6-month certificate of deposit at National Permanent and a $3,250 check withdrawal. After completion of the bond purchases, the family trust's savings account balance was $3,846.44.

Mrs. Gordon received a degree in business administration from Ohio State University. Her decision to enter the joint purchase agreements was based on her perception that, based on Dr. Gordon's life expectancy, it was a good investment for the family trust to invest some 50 percent of the cost of the bonds in order to receive 100 percent of the proceeds on the death of Dr. Gordon, and that, even if Dr. Gordon outlived his life expectancy, he would then be around to provide financial assistance to the beneficiaries, i.e., the children, either directly or through augmentation of the family trust.[5] Beyond this, Mrs. Gordon did not consider present values or income yields for the investments. Mrs. Gordon also did not consider wheth-

---

[5]The record contains no indication that Mrs. Gordon gave any consideration to the fact that Dr. Gordon might not be in a position to give such financial assistance if he became disabled and could no longer carry on his medical practice.

er the excess of the family trust's bond proceeds over its cost bases would be taxed as capital gain or ordinary income.

Petitioners claimed the following amortization deductions for "purchase—life estate":

| Year | Date acquired | Basis | Percentage | Depreciation |
|------|---------------|-------|------------|--------------|
| 1976 | 2/23/73 | $58,904 | .1090 | $6,421 |
|      | 7/ 8/74 | 14,169 | .0945 | 1,339 |
|      | 7/27/76 | 52,046 | .0617 | 1,338 |
|      |         |        |       | 9,098 |
| 1977 | 2/23/73 | $58,904 | .1090 | 6,421 |
|      | 7/ 8/74 | 14,169 | .0945 | 1,339 |
|      | 7/27/76 | 52,046 | .0617 | 3,211 |
|      |         |        |       | 10,971 |
| 1978 | 2/23/73 | $58,904 | .1090 | 6,421 |
|      | 7/ 6/74 | 14,169 | .0945 | 1,339 |
|      | 7/27/76 | 52,046 | .0617 | 3,211 |
|      | 7/25/77 | 50,456 | .0707 | 3,567 |
|      | 1/31/77 | 50.690 | .0707 | 3,584 |
|      | 2/ 3/78 | 50,954 | .0678 | 3,167 |
|      |         |        |       | 21,289 |

## OPINION

At issue is the deductibility ratably over Dr. Gordon's expected life of his cost of acquiring his income interests in the bonds purchased pursuant to the joint purchase agreements. Petitioners argue that Dr. Gordon purchased his interests in bona fide transactions, and that such interests are wasting assets eligible for ratable deduction. Respondent's contention has two parts: (1) While, in form, the purchases were joint, in substance Dr. Gordon purchased the bonds in whole and donated the remainder interests to the trusts; thus, (2) petitioners' attempt to create an amortization deduction by splitting an existing nondepreciable asset must be rejected.

It is clear that a taxpayer may deduct ratably his or her cost basis in a *purchased* term, including a life, interest.[6] *Early v.*

---

[6]There has been considerable controversy as to whether these ratable deductions are allowable as depreciation or amortization under sec. 167 or as amortization under secs. 162 and 212. See *Sohosky v. Commissioner*, 57 T.C. 403, 409 & n. 4 (1971), affd. 473 F.2d 810 (8th Cir. 1973); *Early v. Commissioner*, 52 T.C. 560, 568–572 (1969) (Tannenwald, J., dissenting). For purposes of discussion herein, we simply acknowledge that ratable deductions of some nature are allowable to a purchaser of a term interest in property either used in a trade or business or held for the

*Commissioner*, 445 F.2d 166, 169 (5th Cir. 1971), revg. on another ground 52 T.C. 560 (1969); *Manufacturers Hanover Trust Co. v. Commissioner*, 431 F.2d 664 (2d Cir. 1970), affg. a Memorandum Opinion of this Court; *Gist v. United States*, 296 F. Supp. 526, 528 (S.D. Cal. 1968), affd. 423 F.2d 1118 (9th Cir. 1970); *Frank MacBoyle Lewis Trust B v. Commissioner*, 83 T.C. 246, 253 n. 10 (1984); *Elrick v. Commissioner*, 56 T.C. 903, 909 (1971), revd. on another ground 485 F.2d 1049 (D.C. Cir. 1973); see also secs. 167(h), 62(6).[7] This is true even where the property underlying the purchased term interest is itself nondepreciable. See, e.g., *Early v. Commissioner, supra; Manufacturers Hanover Trust Co. v. Commissioner, supra; Elrick v. Commissioner, supra.* However, it is also clear that where a taxpayer, without additional investment, *divides nondepreciable property into two parts*, one of them being a term interest, amortization deductions are not allowable. *United States v. Georgia Railroad & Banking Co.*, 348 F.2d 278, 286–289 (5th Cir. 1965); *Lomas Santa Fe, Inc. v. Commissioner*, 74 T.C. 662, 681–684 (1980), affd. 693 F.2d 71 (9th Cir. 1982).

In *United States v. Georgia Railroad & Banking Co., supra,* the corporate taxpayer had "leased" certain of its stockholdings to an individual, and later distributed its reversionary interest therein to its shareholders as a dividend in kind. After holding that the leasehold that the taxpayer created in nondepreciable stock was itself not depreciable property, as the taxpayer incurred no additional costs in acquiring the leasehold, the Court of Appeals for the Fifth Circuit held that the dividend distribution of the reversion did not make the retained "lease" a depreciable asset. According to the court—

By distributing the reversion in 1954, taxpayer did nothing more than split its bundle of property rights into two parts. We cannot see how this action on its part can result in a depreciable asset where none previously existed, unless it made some additional investment. * * * Depreciability cannot be conferred merely by the voluntary, gratuitous division of its nondepreciable property into two segments, one of which becomes, as a result of the

---

production of income. For convenience, we have used the term "amortization" in discussing the transactions involved herein.

In this connection, we note that respondent, in his opening brief, dropped the argument that petitioners' deductions are not allowable due to sec. 265(1), which disallows deductions allocable to tax-exempt income. See *Manufacturers Hanover Trust Co. v. Commissioner*, 431 F.2d 664 (2d Cir. 1970), affg. a Memorandum Opinion of this Court.

[7] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

separation, wasting solely by reason of lapse of time. [*United States v. Georgia Railroad & Banking Co., supra* at 288–289.]

Similarly, in *Lomas Santa Fe, Inc. v. Commissioner, supra*, the taxpayer owned land on which it planned to develop a luxury community, and, for business reasons relating to State law, formed a wholly owned subsidiary to hold the portion of the land designated for a golf course and country club, which the taxpayer transferred to the subsidiary subject to a retained estate for 40 years. Noting that we were "faced with the unsettling fact that [the taxpayer] apparently has converted a patently nondepreciable asset to one which is depreciable by simply relinquishing part of its interest in that property" (74 T.C. at 680 (see also 693 F.2d at 72)), this Court, relying on *Georgia Railroad*, held that the retention of an interest which was created by a division of property is distinguishable from the purchase of a similar interest. 74 T.C. at 683. Because the underlying property was nondepreciable land, and the taxpayer merely separated it into two interests without any separate investment in the retained estate, we held that the taxpayer was not entitled to amortize its basis in the term interest. 74 T.C. at 684. Our rationale was adopted by the Court of Appeals for the Ninth Circuit. 693 F.2d at 72–73.

In the instant case, the property in question is bonds, a type of property generally considered to be nonamortizable. See 4 J. Mertens, Law of Federal Income Taxation, sec. 23.49 (1980); see also sec. 1.167(a)–3, Income Tax Regs.[8] In form, Dr. Gordon purchased term interests in the income from the bonds, and the trusts purchased remainder interests therein. Technical considerations of title or the law of trusts, however, are not so important as the substance of the transaction in question; thus, formally separate steps in an integrated and interdependent series that is focused on a particular end result will not be afforded independent significance in situations in which an isolated examination of the steps will not lead to a determination reflecting the actual overall result of the series of steps. *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945); *Helvering v. Clifford*, 309 U.S. 331, 334 (1940); *Griffiths v. Helvering*, 308 U.S. 355, 357–358 (1939); *Professional Services v. Commissioner*, 79 T.C. 888, 913 (1982). In short, while not

---

[8]*Scheid v. Commissioner*, T.C. Memo. 1983–427.

ignoring the form by which the transaction involved herein was accomplished, we will look primarily to the substance of what occurred. In so doing we think it important to note that what is involved in this case is a simultaneous joint acquisition of income interests and remainder interests where the consideration moved to a third party who was not in any way concerned with the arrangements between the joint acquirers. In this respect, the instant situation is distinguishable from that involved in the decided cases wherein an amortization deduction was allowed in respect of a purchased term interest; in those cases, only two parties were involved and consideration moved directly between them. See cases cited *supra* pp. 322–323. In the context of a simultaneous, joint acquisition from a third party, it is appropriate to take into account the fact that the participation of the acquirer of the remainder interest is an essential element in affording the acquirer of the income interest the opportunity to obtain the tax benefit of an amortization deduction.[9] This is particularly significant where the acquirer of the income interest and the acquirer of the remainder interest are related persons. If the facts in this case, evaluated in the context of the foregoing considerations, lead to the conclusion that Dr. Gordon in substance purchased full ownership of the bonds and transferred remainder interests to the trusts,[10] the rationale of *Lomas Santa Fe, Inc. v. Commissioner, supra,* and *United States v. Georgia Railroad & Banking Co., supra,* requires a holding that Dr. Gordon did no more than attempt to create an amortization deduction by splitting nondepreciable assets and that respondent's disallowance of the claimed deduction should be sustained.

Petitioners have the burden of proving that respondent's determination is erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure. Moreover, where, as here, both parties to the transactions in question are related, the level of

---

[9] Here again, the absence of the movement of consideration between the joint acquirers herein sets this situation apart from that involved where the acquirer of an income interest pays the owner of the entire property for that interest and the owner retains the remainder interest. Even in the latter instance, the transaction may be suspect if such ownership was acquired at a point of time close to the time when the income interest was transferred, particularly where the owner of the entire property and the acquirer of the income interest are related persons.

[10] We note that, for purposes of our decision herein, it is unnecessary to decide whether Dr. Gordon made gifts to the trusts of the remainder interests; the deductibility of the amortization depends solely on whether in substance Dr. Gordon purchased whole bonds or term interests in the income therein.

skepticism as to the form of the transaction is heightened, because of the "greater potential for complicity between related parties in arranging their affairs in a manner devoid of legitimate motivations." *Vaughn v. Commissioner*, 81 T.C. 893, 908 (1983); see *Bowen v. Commissioner*, 78 T.C. 55, 78 (1982), affd. 706 F.2d 1087 (11th Cir. 1983). However, this skepticism does not extend to a presumption that, where the settlor and trustee of a trust are husband and wife, the trustee will act in accordance with the settlor's wishes. *Phipps v. Commissioner*, 137 F.2d 141, 144 (2d Cir. 1943); *Newman v. Commissioner*, 1 T.C. 921, 924 (1943); cf. sec. 672(c); *Gutchess v. Commissioner*, 46 T.C. 554, 558–559 (1966) (Tannenwald, J., concurring). Taxpayers have the right to decrease or avoid their taxes by means that the law permits, *Gregory v. Helvering*, 293 U.S. 465, 469 (1935); on the other hand, where as is the case herein, there is such a marked pattern of tax benefits, we may view such pattern as "a yellow caution signal on our road to decision." See *Schultz v. Commissioner*, 50 T.C. 688, 694 (1968), affd. per curiam 420 F.2d 490 (3rd Cir. 1970).

Petitioners cite cases in which courts have refused to recharacterize formal gifts of corporate stock to charitable foundations immediately before the redemption of the shares (*Behrend v. United States*, an unreported case (4th Cir. 1972, 31 AFTR 2d 73–406, 73–1 USTC par. 9123); *Palmer v. Commissioner*, 62 T.C. 684 (1974), affd. on another issue 523 F.2d 1308 (8th Cir. 1975)), and cases upholding installment sale treatment for sales to a purchaser related to the seller occurring immediately before resale by the purchaser (*Weaver v. Commissioner*, 71 T.C. 443 (1978), affd. 647 F.2d 690 (6th Cir. 1981); *Roberts v. Commissioner*, 71 T.C. 311 (1978), affd. 643 F.2d 654 (9th Cir. 1981); *Pityo v. Commissioner*, 70 T.C. 225 (1978); *Rushing v. Commissioner*, 52 T.C. 888 (1969), affd. 441 F.2d 593 (5th Cir. 1971)). Respondent cites cases in which trusts were found to be convenient conduits in the context of denying interest deductions for debt to the trusts (*Perrett v. Commissioner*, 74 T.C. 111, 133–134 (1980), affd. without published opinion 679 F.2d 900 (9th Cir. 1982); *Elbert v. Commissioner*, 45 B.T.A. 685 (1941)), and recent installment sale cases in which the Court scrutinized the economic, non-tax substance of the related party's role in the transaction (*Wrenn v. Commissioner*, 67 T.C. 576 (1976); see also *Vaughn v. Commissioner, supra;*

*Bowen v. Commissioner, supra*). While each of these cases discusses analogous situations, none is relevant to the issue herein—i.e, whether, in substance, petitioners have attempted to create a deduction by splitting nondepreciable property. Keeping in mind that the issue of substance over form arises "in factual scenarios that do not bear precise repetition" (see *Bowen v. Commissioner, supra* at 79), we think that, while somewhat analogous, these cases are sufficiently distinguishable in terms of their factual context and the issue involved so as not to furnish any significant guidance in reaching our decision herein.

We turn first to the agreements with the family trust. The agreement of July 10, 1974—the first joint purchase agreement involving the family trust—may be disposed of easily. Unlike the situation with all the later purchase agreements, the record contains no evidence that the family trust ever made any payments pursuant to the agreement of July 10, 1974. The record includes no payments by Mrs. Gordon as trustee for remainder interests purchased, and the relevant Ferris & Co. statement shows one payment credit, rather than two partial credits, for each of the bonds. Thus, petitioners have clearly not satisfied their burden of proving that Dr. Gordon did not purchase the July 10, 1974, bonds in full and then transfer remainder interests to the family trust, with the result that, under *United States v. Georgia Railroad & Banking Co., supra*, and *Lomas Santa Fe, Inc. v. Commissioner, supra*, petitioners' amortization deductions with respect to the income interests in these bonds were properly disallowed.

The other joint purchase agreements with the Family Trust, while somewhat tougher calls, require the same result.[11] To be sure, the remainder interests were all paid for with checks endorsed over by Mrs. Gordon as trustee of the family trust, and the Ferris & Co. monthly statements show partial payment credits for each bond, reflecting the allocation between the income and remainder interests. However, the facts concerning Mrs. Gordon, the family trust's cash picture, and

---

[11]We think it of some significance that the purchase agreements with the family trust did not contain the 25-year cutoff of Dr. Gordon's income interests contained in the purchase agreement with the pension trust, which was recommended "To protect the trust and assure that its return on its investment would not fall below a 4 percent compounded rate." See *supra* pp. 311–312. We also note that the advice contained in the letter from Messrs. Diamond and Johnson (see *supra* pp. 311–313) made no mention of using the family trust.

petitioners' gift-tax treatment of the bulk of their cash transfers to the family trust point to the conclusion that Dr. Gordon bought the whole bonds, using the family trust as a mere stopping place for a portion of their purchase prices.

The family trust was established, after its predecessor trust had ceased to exist, some 27 months prior to execution of the first purchase agreement involving the family trust and some 10 months before execution of the purchase agreement with the pension trust, which was used only because the family trust lacked cash funds at that time. Dr. Gordon had become aware of the bond investment strategy some 3 months before the first purchase agreement was executed. Mrs. Gordon opened a savings account for the family trust just 1 day before the first bond transaction involving the family trust took place, and Dr. Gordon apparently paid for both the income and remainder interests purchased pursuant to that transaction because the family trust's cash position did not permit its participation. In this connection, we note that this was the case even though the family trust had stock holdings that, if a portion thereof had been sold, would have provided sufficient cash to permit such participation. The foregoing circumstances indicate that the family trust was intended to be used as a vehicle for implementing Dr. Gordon's investment strategy only to the extent that is was provided with sufficient cash funds by petitioners or other related entities.[12]

The later operations of the family trust also indicate that the trust made no real purchases, but was merely a way station for the accumulation of cash provided for the most part by petitioners. During 1975, there were no bond transactions and the bank account was fairly inactive. In 1976, at least $78,140.64 of the deposits totaling $95,043.94 (over 82 percent) came from Dr. Gordon,[13] and only $32,775 of this amount was

---

[12]Dr. Gordon testified that he never considered the possibility of the family trust selling some of its stockholdings and using the cash proceeds to participate in the implementation of the bond purchase agreements. In fact, the record indicates that in the 2 years (1972 and 1975) in which the family trust sold some of its common stockholdings, the proceeds were promptly reinvested in other stocks.

[13]Petitioners state on brief that the deposits to the family trust account "included deposits of the investment income of the [children's] Individual Trusts, the trusts established by Freda Gordon (Dr. Gordon's mother) during her life, the trusts established by the Estate of Freda Gordon, gifts from [petitioners] and its own investment earnings." Respondent computed the maximum amount of income *available* for deposit from the children's various trusts for 1976 and 1977, and petitioners did not object to these computations in their reply brief. We have computed the amount for 1978 in a manner identical to that used by respondent for 1976 and 1977, and have included such amount in our findings of fact.

reported by petitioners on their gift tax returns. Petitioners' failure consistently to treat as gifts the amount they contend were given to the trust as gifts is indicative of use of the trust as a mere stopping place for the cash used to enable Dr. Gordon to purchase his income interests. Moreover, $47,591.76 of the 1976 withdrawals from the account totaling $51,319.71 (over 92 percent) was used to implement bond acquisition transactions, and $1,332.81 was left in the account after such transactions were completed. In 1976, then, the trust appears to have been funded for little purpose other than to participate with Dr. Gordon in the implementation of his bond acquisition strategy, a fact that further indicates that Dr. Gordon should be treated as the true purchaser of the whole bonds.

Similarly, during 1977, at least $58,099.74 of the deposits to the bank account totaling $78.458.89 (over 74 percent) came from Dr. Gordon, and none of this amount was reported by petitioners on their gift tax returns. All of the 1977 withdrawals from the account totaling $97,852.92 were used in implementing the bond transactions, and $3,066.44 and $1,055.67, respectively, remained in the account after the transactions encompassed by the two 1977 purchase agreements were completed. During 1978, at least $56,386.38 of the deposits totaling $91,431.61 (over 61 percent) came from Dr. Gordon, and none of this amount was reported by petitioners on their gift tax returns. Of the 1978 withdrawals from the account totaling $71,963.35, $48,713.35 (almost 68 percent) was used to implement the bond transactions, and $3,846.44 remained in the account after such transactions were completed. Thus, the evidence indicates that Dr. Gordon funded the trust in order to enable himself to enter the bond transactions with a third party.

Finally, Mrs. Gordon's role as trustee further reveals the substance of the transactions. While a business degree recipient who read investment periodicals, Mrs. Gordon apparently did not have an independent role in the decisions to purchase the bonds. When asked at trial whether she inquired into the income yield used in calculating the cost of the remainder interest to the trust, she said she thought doubling the trust's investment was "a good deal," despite the uncertainty as to how long it would be before the trust received the proceeds. Mrs. Gordon professed an inability to understand questions

about rate of return on investment, and never thought about whether or how, i.e., as ordinary income or capital gain, the gain on the excess of the proceeds of the bonds over the amounts provided by the family trust would be taxable. This lack of knowledge of and indifference to the ultimate tax consequences to the family trust, coupled with the obvious uncertainty as to Dr. Gordon's life span and future earning potential and the fact that most of the bonds would mature long after the expiration of Dr. Gordon's life expectancy, casts serious doubt on the independent role of Mrs. Gordon as trustee.[14]

In sum, we hold that the petitioners have failed to carry their burden of proof that the family trust was the purchaser of the remainder interests and that, in substance, Dr. Gordon was not the purchaser of the whole bonds and the family trust the transferee of the remainder interests from him.

We reach the same conclusion with respect to the first joint purchase agreement with the pension trust. The record in regard to the status of the pension trust is extremely sparse. The pension plan, but not the trust agreement, is in evidence (see *supra* note 1), so that we have no hint as to Dr. Gordon's powers as trustee over the trust income and corpus. Nor does the record contain any probative evidence as to the financial activity or the financial status of the pension trust for the period of the first 3 months of 1973, when the first purchase agreement was executed and implemented. The only evidence of record as to the financial picture of the pension trust is represented by the Annual Employer's Return for Employees' Pension or Profit Sharing Plans (Form 4848) and the Financial Statement of Employers' Pension or Profit Sharing Fund or Fiduciary Account (Form 4849) for the period July 1, 1973, to June 30, 1974. The former document merely indicates the

---

[14]Describing the decision-making process between herself and Dr. Gordon, Mrs. Gordon testified as follows:

"And I would say, 'Everett, look how much we have got here, let's put it into something.' So we'd say whether we were going into a real estate venture or, and then I would say, 'Look what the children, how much the children have in that family trust at the bank. * * * Let's buy another life tenant agreement.' "

We do not consider this testimony indicative that Mrs. Gordon, as trustee, played an independent role in determining the implementation of the bond investment strategy. Rather, we think it indicates that Mrs. Gordon was simply saying to her husband that the family trust was in a position to enable *him* to execute *his* strategy.

amounts claimed to have been contributed by Dr. Gordon's professional corporation for the fiscal year periods ending on each year commencing with June 30, 1970, through June 30, 1974. Clearly, the foregoing evidence is insufficient to enable petitioners to carry their burden of proof that the pension trust was the purchaser of the remainder interests in the 1973 transaction and that, in substance, Dr. Gordon was not the purchaser of the whole bonds and the pension trust merely the transferee of the remainder interests from him.[15] Nor can that burden be satisfied by concluding that the fact that the pension trust was a qualified exempt organization under section 401, et seq. (which respondent does not dispute) establishes its independence for the purpose of determining the issue involved herein.

Based upon the foregoing analysis, the rationale of *United States v. Georgia Railroad & Banking Co, supra* and *Lomas Santa Fe, Inc. v. Commissioner, supra*, dictates the conclusion that the amortization deductions were properly disallowed.[16]

Due to concessions by the parties,

*Decision will be entered under Rule 155.*

---

[15]Even if we were inclined to be lenient and to accept evidentiary material on this issue set forth in the parties briefs, it would not be of any avail to petitioners, since neither party's briefs contain any helpful material.

[16]We reject petitioners' argument that the fact that the trust was free to refuse to participate in any or all of the joint purchase transactions indicates that the trust's role as purchaser had substance. For purposes of this question, the power to refuse is a fact to consider (see *Allen v. Commissioner*, 66 T.C. 340, 347-348 (1976)), but is of minimal significance where, as here, the facts reveal that the entire transaction was set up around the expectation that the joint implementation of the Gordon's investment strategy would occur. See *Blake v. Commissioner*, 697 F.2d 473, 478-481 (2d Cir. 1982), affg. a Memorandum Opinion of this Court. Compare *Buehner v. Commissioner*, 65 T.C. 723 (1976), a case relied upon by petitioners and which we find distinguishable on its facts.

Given our holding herein, we need not decide whether respondent's argument based on the grantor trust provisions (sec. 671, et seq.), adverted to for the first time in respondent's trial memorandum, was made too late to be considered. See *Johnsen v. Commissioner*, 83 T.C. 103, 120 (1984); *Aero Rental v. Commissioner*, 64 T.C. 331, 338 (1975).