T.C. Memo. 2009-90

UNITED STATES TAX COURT

LARRY D. KLAAS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

LARRY D. KLAAS, LISA G. KLAAS, and APEX INSURANCE COMPANY, AN
ANGUILLA BRITISH WEST INDIES CORPORATION, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 16774-06, 19803-06.   Filed April 29, 2009.

<u>David E. Ross II</u>, for petitioners.

<u>Richard W. Kennedy</u> and <u>Kirk M. Paxson</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  These consolidated cases are before the Court
for determination of the tax consequences of the sale of a
recreational vehicle park in 2001.  Respondent determined that
petitioners Larry D. Klaas and Lisa G. Klaas are subject to tax

on the sale of the recreational vehicle (RV) park as Mr. Klaas was the sole shareholder of the passthrough entities that held title to the property.

Respondent determined deficiencies in Federal income tax and penalties for 2000 and 2001 against petitioners Larry D. Klaas and Lisa G. Klaas (petitioners Klaas or petitioners) and determined a Federal income tax deficiency and penalty against Mr. Klaas for 2002 as follows:[1]

|  |  | Penalties | |
| Year | Deficiency | Sec. 6663 | Sec. 6662(a) |
| 2000 | $54,989 | --- | $10,998 |
| 2001 | 2,241,548 | $1,681,161 | --- |
| 2002 | 216,933 | --- | 43,387 |

For 2001 respondent determined in the alternative to the fraud penalty that petitioners are liable for a section 6662(a) accuracy-related penalty.

Respondent has conceded the deficiency and penalty against petitioners for 2000. Mrs. Klaas is a party herein only because she filed joint income tax returns with Mr. Klaas for 2001 and 2002. Respondent has not argued the fraud penalty against Mrs. Klaas for 2001, and we find that respondent has conceded the fraud penalty against Mrs. Klaas.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code), and all Rule references are to the Tax Court Rules of Practice and Procedure. Amounts are rounded to the nearest dollar.

As a protective measure respondent issued a notice of deficiency to Apex Insurance Co. (Apex) for 2001 which determined that Apex is subject to tax on the sale of the recreational vehicle park in the event that we find that petitioners Klaas are not subject to tax on the sale of the recreational vehicle park. For 2001 respondent determined against Apex a Federal income tax deficiency of $2,720,000, a section 6651(a)(1) addition to tax of $680,000, a section 6651(a)(2) addition to tax to be determined on the basis of the entire deficiency, and a section 6654 estimated tax penalty of $115,749.

As a protective measure respondent also issued a notice of deficiency to Mr. Klaas for 2002 in the event that we find that he is not subject to tax on the sale of the recreational vehicle park in 2001. For 2002 respondent determined on the basis of a purported shareholder loan that Mr. Klaas received a constructive dividend from Apex of $678,689. Respondent also determined a Federal income tax deficiency of $216,933 and a section 6662(a) accuracy-related penalty of $43,387 against Mr. Klaas.

FINDINGS OF FACT

The stipulation of facts and the accompanying exhibits are incorporated by this reference. Mr. Klaas resided in Wyoming at the time of filing his petition. Mrs. Klaas resided in Washington at the time of filing her petition. Apex is an insurance company organized under the laws of Anguilla British

West Indies, and its place of business and registered office were in Utah at the time its petition was filed.

Mr. Klaas is engaged in the development and management of recreational vehicle parks throughout the United States. Mr. Klaas has sold four RV parks for a profit after making repairs to the properties, including the RV park at issue, the Silver Spur RV park (Silver Spur) in Mesa, Arizona. Mr. Klaas continued to own and manage other RV parks after selling Silver Spur. In 1999 Mr. Klaas owned Silver Spur through Klaas Development, Inc. (KDI), an S corporation. At that time Mrs. Klaas held an interest in KDI. In mid-2000 Ms. Klaas disposed of all her shares in KDI. By the beginning of 2001, the year of the sale, Mr. Klaas was KDI's sole shareholder. Before Mr. Klaas became involved in the purchase and management of Silver Spur, he was engaged in diverse lines of work, including accounting for 8 months following college, importing bicycles, selling airplanes, running a family farm for 7 years, and working as a real estate broker.

In early 1999 Mr. Klaas sought tax planning and investment advice from Merrill Scott Associates (MSA) regarding his ownership of Silver Spur RV park. In an April 12, 1999, letter to MSA, Mr. Klaas indicated that he anticipated refinancing Silver Spur and reinvesting the equity into other business

ventures.[2]  He estimated the value of Silver Spur at $6 to $6.5

million.  Mr. Klaas specifically expressed an interest in

investing in a New Zealand mortgage company.  Mr. Klaas

understood that real estate loans in New Zealand earned high

interest rates and New Zealand imposed a low tax rate on interest

income earned by foreign investors.  He stated that he wanted to

form "an entity somewhere that would not have to pay US taxes".

The letter also indicated Mr. Klaas's intent to purchase real

property in the United States using the equity from Silver Spur.

In the April 12, 1999, letter Mr. Klaas asked MSA for advice

concerning the creation of an offshore entity for his investment

in the New Zealand mortgage company, how to structure ownership

of future U.S. real estate purchases, and how to structure

ownership of an experimental aircraft.  On July 6, 1999, MSA

presented a proposal to Mr. Klaas for a financial master plan

that outlined the formation of multiple foreign entities and U.S.

entities for tax planning purposes.  Mr. Klaas executed an

engagement letter with MSA in November 1999.  At that time Mr.

Klaas informed MSA that he had decided not to pursue the New

---

[2]The parties stipulated that the Apr. 12, 1999, letter stated that Mr. Klaas anticipated selling Silver Spur RV park for approximately $6 to $6.5 million.  However, the letter did not say a sale was anticipated.  The letter stated because of trading restrictions, "I think I'll just keep the Mesa park, refinance it every 5-7 years to pull out equity".  The Court may set aside a stipulation that is clearly contrary to the facts disclosed by the record.  See Jasionowski v. Commissioner, 66 T.C. 312, 318 (1976).

Zealand mortgage company investment and intended to invest all his equity from Silver Spur RV park in U.S. real property. Mr. Klaas also informed MSA of his plan to refinance Silver Spur RV park and indicated that it then had a market value of $8 million.

In December 1999 Mr. Klaas refinanced Silver Spur RV park to receive approximately $1 million in equity from the property. On December 8, 1999, KDI conveyed title to Silver Spur RV park to Silver Spur Holdings, L.L.C., on account of a bank requirement for the refinancing. Silver Spur Holdings was incorporated on November 19, 1999, and KDI was its sole shareholder. Silver Spur Holding is a disregarded entity for Federal tax purposes. See sec. 301.7701-3(b), Proced. & Admin. Regs. On December 30, 1999, Silver Spur Holdings received an offer from Cal-Am Properties, Inc. (Cal-Am), to purchase Silver Spur RV park for $8 million. At that time Mr. Klaas discussed Silver Spur with MSA the creation of another entity to act as the seller of Silver Spur RV park although details of the plan are not clear from the record. Mr. Klaas also discussed with MSA the use of a deferred annuity to delay tax on the sale. Mr. Klaas expressed concerns to MSA about his Arizona State tax liability from the sale of Silver Spur RV park. Because of these concerns, Mr. Klaas changed his legal residence to the State of Washington.

In February 2000 Mr. Klaas informed MSA that he did not want to implement the financial master plan as it related to the sale

of Silver Spur RV park because of Federal and State tax concerns that the plan did not adequately address. Mr. Klaas also stated that he understood from his communications with MSA that there was "no real tax advantage from foreign entities investing in US real estate". Mr. Klaas continued to negotiate with Cal-Am over the sale of Silver Spur into March 2000, but Mr. Klaas ultimately decided not to sell the property. MSA has since been enjoined from any sales activities, and a receiver was appointed to distribute its assets to defrauded investors.

In April 2001 Mr. Klaas again refinanced Silver Spur to obtain approximately $1 million in equity from the property. On July 17, 2001, Cal-Am made a second offer to purchase Silver Spur from Silver Spur Holdings for $7.75 million. Mr. Klaas engaged in negotiations including the purchase price. In July 2001 Mr. Klaas made a counteroffer for $8 million and also changed the seller to include "an entity to be formed". Mr. Klaas sought to delay the sale for tax planning purposes. On July 19, 2001, Mr. Klaas sent an email to Cal-Am that requested a delay in the sale of Silver Spur for 6 months because of estate planning and a need to get his "ducks in a row", which Mr. Klaas explained to mean time to set up a foreign captive insurance company as the owner of Silver Spur to minimize U.S. taxes on the sale.

Before receiving this second offer from Cal-Am, Mr. Klaas had sought tax planning and investment advice from Cornerstone Strategic Advisors (Cornerstone). Mr. Klaas had previously worked with the two principals of Cornerstone--Roger Fuller, a certified public accountant, and Michael Bishop, a tax attorney, when they worked for MSA. Mr. Bishop and Mr. Fuller left MSA in 2000 to form Cornerstone. Mr. Bishop and Mr. Fuller recommended forming a foreign captive insurance company that would qualify for tax-exempt status under section 501(c)(15) as the owner of Silver Spur to avoid U.S. tax on a sale. Cornerstone had also recommended foreign captive insurance companies as a tax planning device to other clients. Mr. Fuller and Mr. Bishop explained to Mr. Klaas the tax advantages of the insurance company and the ability to self-insure. Mr. Klaas was interested in self-insurance for an experimental turbine engine aircraft that he was having built. Mr. Klaas could not obtain insurance to pilot the airplane because he did not have sufficient flight experience.

On October 8, 2001, Mr. Klaas incorporated Apex under the laws of the Cook Islands, as a controlled foreign corporation within the meaning of section 957(a). Mr. Klaas is the sole shareholder of Apex. On that same date Mr. Klaas executed an agreement and plan of merger on behalf of KDI and Apex. Pursuant to the plan of merger, KDI was to merge into Apex with Apex surviving in a transaction intended to qualify as a

reorganization under section 368(a)(1)(A) (an "A" reorganization) and KDI would cease to exist. Under the plan of merger Mr. Klaas would transfer all of his shares in KDI to Apex, the KDI shares would be canceled, and Mr. Klaas would receive newly issued shares of Apex. The plan of merger contemplated that the merger would occur on October 15, 2001, if the parties had satisfied all conditions to the merger by that date. The plan of merger stated that the merger would become effective upon the filing of the merger documents. The plan of merger permitted the parties to terminate the agreement at any time before the effective date by mutual consent or by unilateral action of either party if the merger was not consummated on or before December 31, 2001. KDI and Apex filed the merger documents with the State of Washington on March 1, 2002.

On November 14, 2001, Silver Spur was sold for $8 million with Silver Spur Holdings listed as the seller to Norton Karno (Mr. Karno). Cal-Am assigned its contractual right to purchase Silver Spur to Mr. Karno shortly before the sale. Cornerstone was not involved in the negotiations for the sale of Silver Spur. After payment of the mortgage of approximately $5 million and closing costs, the proceeds were deposited into KDI's bank account. Later that month KDI wired approximately $3 million in proceeds to Apex. The legal documents prepared in connection with the sale list Silver Spur Holdings as the transferor,

seller, grantor, or titleholder and were signed by Mr. Klaas as president of KDI, Silver Spur Holdings' sole member. The documents include: A master final settlement statement, a general warranty deed, a nonforeign certification, a Form 1099 certification, a bill of sale, and an owner's affidavit and indemnity. None of the documents lists Apex as a shareholder of KDI. Mr. Klaas as president of KDI executed a document, under penalties of perjury, labeled "Non-Foreign Certification" that states the transferor was not a foreign person, a foreign corporation, or foreign estate as defined by the Code. The purpose of the certification is to inform the transferee that withholding is not required under section 1445(a), which requires 10-percent withholding of the amount realized on the sale of U.S. real property by a foreign person. See sec. 1.1445-2(b)(2), Income Tax Regs. The certification provided KDI's taxpayer identification number as the transferor.

Apex became licensed as an insurance company on November 14, 2001. Cornerstone assisted with obtaining a corporate charter and insurance license for Apex. Mr. Klaas has been the sole employee of Apex since its inception. Upon receiving its license, Apex engaged Sovereign Insurance Management L.L.C. (Sovereign), an entity related to Cornerstone, to provide insurance management services. On December 15, 2001, Sovereign executed three income replacement policies for unrelated persons

on Apex's behalf with gross annual premiums of $350,000. On that same date Apex entered into a reinsurance agreement with Sovereign or a related entity for the three policies, thereby reducing Apex's potential liability from $925,371 to $64,853. As a result of the reinsurance agreement, $325,000 of the $350,000 on account of the gross premiums shown on Apex's 2001 return was ceded to the reinsurance company, reducing Apex's net premium income to $25,000. Apex reported the ceded insurance premiums as an expense on its 2001 return. Apex's general ledger for 2001 listed accounts receivable of $350,000 on account of the gross premiums from the three policies, recorded as "unearned policy premiums".

Apex did not receive payment for the $25,000 in net premiums from the three income replacement policies. Nor does the record establish that Sovereign received payment for any amount of the premiums on these policies. Mr. Klaas terminated Apex's relationship with Sovereign in 2002 because he was dissatisfied with its management services. Upon termination of Apex's relationship with Sovereign, Apex received a refund of its management fees of $70,000, which included a $25,000 credit for the uncollected premiums.

Apex did not issue any insurance policies in 2002 and did not renew the three income replacement policies from 2001. Apex's general ledger for 2002 continued to show $350,000 in

accounts receivable from the three income replacement policies from 2001. In late December 2003 Apex issued two insurance policies each with a 1-year term: An aviation liability policy to Winchester Management, Inc., wholly owned by Mr. Klaas, to insure an experimental aircraft to be piloted by Mr. Klaas, with an $8,400 annual premium, and a professional liability policy for cosmetic medicine and laser treatment (med-spa policy), with a $5,000 annual premium, issued to a day spa in California that performed botox injections and other cosmetic applications. In 2004 Apex reissued the aviation and med-spa policies and issued four additional policies: A life policy on Mr. Klaas with a $5,000 annual premium, a medical malpractice policy with a $15,000 annual premium to a doctor who lost his hospital privileges and was unable to obtain insurance from other insurance companies, a health policy to Mr. Klaas with a $5,000 annual premium, and a legal services policy to Mr. Klaas with a $1,000 annual premium. In 2005 Apex reissued five policies from 2004 (with the exception of the med-spa policy) with the same annual premiums and issued a pollution policy with a $12,000 premium to a company of which Mr. Klaas owned 50 percent. Apex reinsured all of the policies issued in 2004 and 2005 to reduce its risk under the policies.

The annual premiums from the above policies are as follows:

| Year | Total No. of Policies | No. of Self-Insurance Policies | Annual Premiums | Premiums From Self-Insurance |
|------|------|------|------|------|
| 2001 | 3 | 0 | $25,000 | -0- |
| 2002 | 0 | 0 | -0- | -0- |
| 2003 | 2 | 1 | 13,400 | $ 8,400 |
| 2004 | 6 | 4 | 29,400 | 14,400 |
| 2005 | 6 | 5 | 36,400 | 21,400 |

No evidence of the receipt of the annual premiums listed above was presented at trial. Apex reported program service revenue on Form 990, Return of Organization Exempt From Income Tax, as follows:

| Year | Revenue |
|------|---------|
| 2001 | $350,000 |
| 2002 | 8,700 |
| 2003 | 25,000 |
| 2004 | 26,000 |
| 2005 | 92,250 |
| 2006 | 97,033 |

Apex did not issue any insurance policies in 2002 but reported program service revenue. During 2005, 2006, and 2007 Apex acted as a reinsurer of policies insured by other insurance providers through a pooling of insurance arrangement and earned revenue through this arrangement that accounts for the revenue reported in excess of the premiums from the above policies issued by Apex. The record does not contain evidence of the policies Apex independently issued, if any, in 2006 and 2007.

Since its inception Apex has sought niche markets within the insurance industry where other insurers would not provide

coverage. However, Apex quickly abandoned these niche markets or did not pursue them because of the costs and risks of the policies. For example, in 2003 Sovereign pursued nursing home insurance on Apex's behalf because few insurers would provide insurance to nursing homes. Similarly, Mr. Klaas thought that Apex found a profitable niche in the med-spa business. After Apex issued the first policy in December 2003, two other spa owners contacted Apex about insurance. Mr. Klaas inquired about obtaining an insurance license in California. However, he decided to abandon med-spa insurance after he learned of the expense associated with obtaining an insurance license in California and a $250,000 lawsuit was filed against the first policy holder. After its decision not to pursue the med-spa industry niche, Apex unsuccessfully sought to partner with another insurance company to write medical malpractice policies so that Apex could avoid State insurance licensing requirements.

In 2006 Apex began to pursue aviation insurance for experimental airplanes, like the one piloted by Mr. Klaas, as a potential niche market. Apex negotiated a joint venture with Prime Insurance Co. (Prime) to write these policies. Mr. Klaas anticipated Apex's receiving a 5-percent commission on any policies issued by Prime. Prime issued one policy for a $25,000 premium. The policy holder filed a claim within 3 months of the policy's issuance. Apex did not pay any portion of the claim

because Apex never finalized its agreement with Prime. Thereafter, Apex's relationship with Prime became contentious, and the parties terminated the relationship.

From 2001 to 2007 Apex engaged five different insurance management companies. Mr. Klaas became dissatisfied with the management companies because of their inability to establish a profitable insurance business for Apex. Three of the management companies prepared business plans for Apex: (1) Sovereign prepared the first plan, dated October 8, 2001; (2) David Ross, the attorney representing petitioners in this proceeding, prepared the second plan in either 2003 or 2004; and (3) Altas Insurance Management prepared the third plan in connection with Apex's move to Anguilla in September 2005.

From its inception, Apex's business plan was for a substantial portion of its business to be self-insurance. Apex's business Spur plan dated October 8, 2001, stated:

> Annuity, Property & Casualty, Directors & Officers, Loss of Income, Life and Business Interruption products shall be issued to and/or for the benefit of Apex principal, Lawrence Klaas, his associates and outside third parties pursuant to private (not public) transactions. At least thirty (30%) of the business written will occur to outside third parties.

Apex planned to rely on outside consulting firms for services, including underwriting and marketing. The business plan also projected net premium income for 2001 of $320,000 and for 2002 of

$350,000. The business plan listed paid-in capital of $100,000 and did not list any capital surplus.

In a May 8, 2002, letter, Mr. Bishop for Sovereign explained to Mr. Klaas the conditions and tax consequences of forming and maintaining an offshore insurance company. The letter explained that Apex's investment income is not subject to tax but that any tax benefits are subject to Mr. Klaas's intent to operate "a real insurance company; the tax benefits are merely incentives that Congress has provided to form and operate bona fide insurance companies." The letter also advised Apex on the need for a substantial part of Apex's premium to originate from unrelated third parties.

On July 2, 2002, KDI filed a final short-year return for 2001 for the period ending October 15, 2001, on Form 1120S, U.S. Income Tax Return for an S Corporation. The return indicated that the boards of directors of Apex and KDI approved the plan of merger on October 8, 2001. The return did not report the sale of Silver Spur. The return reported the merger of KDI with and into Apex on October 15, 2001, and listed KDI stock as the assets transferred from the acquired company in exchange for Apex stock. Mr. Klaas did not report the sale of Silver Spur on his 2001 individual return.

On June 17, 2002, Apex filed an election under section 953(d) to be treated as a U.S. domestic insurance company for the

2001 tax year. The election listed Apex's gross underwriting income and gross investment income in the respective amounts of $350,000 and $4,780,877, for the period from October 7 to December 31, 2001. The election annualized gross income for 2001 to $22,011,462 for purposes of the U.S. asset test described in Notice 89-79, 1989-2 C.B. 392.

On August 6, 2002, Apex submitted Form 1024, Application for Recognition of Exemption Under Section 501(a), to be recognized as a tax-exempt entity as described in section 501(c)(15). On Form 1024, Apex stated its intent to sell property and casualty insurance. On October 15, 2002, Apex filed Form 990 reporting the sale of Silver Spur and reporting total revenues of $5,130,877. Apex claimed that the sale of Silver Spur was not subject to tax because Apex is a tax-exempt insurance company under section 501(c)(15). In May 2003 Mr. Ross provided a legal opinion that Apex qualified as a tax-exempt captive insurance company under section 501(c)(15).

On October 25, 2005, respondent issued a final determination that Apex did not qualify for tax-exempt status under section 501(c)(15). The final determination letter states that Apex did not qualify as an insurance company for 2003 and 2004. The heading of the letter identifies the years at issue as "2001 et seq." and the form required to be filed as Form 1120, U.S. Corporation Income Tax Return, but the body of the letter does

not indicate whether Apex qualified for tax-exempt status for 2001 and 2002.  The letter further states that Apex must file returns on the form and for the years listed above.  The body of the letter does not mention Form 1120.  The Internal Revenue Service has not granted tax-exempt status to Apex for any year at issue.  Petitioners concede that Apex was not an insurance company for 2003 but dispute respondent's determination for 2001, 2002, and 2004.

In 2002, the year following the sale of Silver Spur, Apex lent $678,689 to Mr. Klaas from the proceeds from the sale of Silver Spur.  Mr. Klaas used the loan in part to purchase a personal residence.  Mr. Klaas executed a note on the property with a 4.5-percent interest rate and a maturity date of December 31, 2004.  He also executed a deed of trust to secure the note filed with the county recorder approximately 7 months later.  Mr. Klaas sold the residence on April 18, 2003, and repaid the loan as follows:  $10,000 on April 18, 2003, and $551,469.34 on April 28, 2003.

## OPINION

The issue for decision is the tax consequences of the sale of Silver Spur.[3]  Respondent contends that the facts show that

---

[3]Respondent based the Federal income tax deficiency for 2001 on capital gain on the sale of Silver Spur equal to the $8 million realized without a reduction for the basis in Silver Spur.  The petition assigned error to respondent's failure to account for the basis of Silver Spur as reported on KDI's tax
(continued...)

Mr. Klaas remained KDI's sole shareholder at the time of the sale, that Mr. Klaas did not contribute his KDI stock to Apex before the sale, and that a merger of the two entities did not occur before the sale.  Accordingly, respondent contends that on the facts of the transactions petitioners Klaas are subject to tax on the sale.  In the alternative, respondent relies on substance over form principles, including the sham transaction and the step-transaction doctrines, to argue that Mr. Klaas should be taxed on the sale of Silver Spur in the event we find that a merger or a contribution occurred before the sale. Respondent also presents alternative theories for taxing Mr. Klaas on the gain from the sale of Silver Spur that are based on section 367, relating to the denial of nonrecognition treatment for transfers from a domestic to a foreign corporation, and on section 269, relating to the disallowance rules for tax-motivated corporate transactions.  If the Court determines that petitioners Klaas are not subject to tax on the sale of Silver Spur, we must determine whether Apex is subject to tax on the sale.

## I.   Ownership of KDI at the Time of Sale

The first issue is which entity owned Silver Spur at the time of the sale.  Respondent argues that the merger between KDI

---

³(...continued)
returns.  Petitioners contend that Silver Spur had a cost basis after depreciation of $3,226,231.  The parties attached basis and depreciation information to the stipulation of facts.  Respondent did not address this issue at trial or on brief.

and Apex did not become effective until the filing of the articles of merger with the State of Washington on March 1, 2002, over 3 months after the sale. Thus, respondent argues that Mr. Klaas remained the sole shareholder of KDI at the time of sale. Respondent seeks to tax Mr. Klaas on the basis of the following chain of ownership: Silver Spur was sold by Silver Spur Holdings, a disregarded entity wholly owned by KDI, an S corporation wholly owned by Mr. Klaas. Petitioners do not contest the effective date of the merger argued by respondent or argue that the merger occurred before the sale. Instead, petitioners argue: (1) The Court should not consider respondent's effective date argument because it is a new issue being raised for the first time on brief, and (2) Mr. Klaas made a capital contribution of his KDI stock to Apex on October 8, 2001, the date Apex was incorporated. Petitioners appear to argue that the contribution was a separate transaction from the merger and occurred before the merger.

A party may not raise a new issue on brief where consideration of the issue would surprise or prejudice the opposing party. See Smalley v. Commissioner, 116 T.C. 450, 456 (2001); 508 Clinton St. Corp. v. Commissioner, 89 T.C. 352, 353 n.2 (1987); Gordon v. Commissioner, 85 T.C. 309, 331 n.16 (1985). In his opening statement, respondent contended that the sale of Silver Spur occurred before the merger. Respondent's trial

position contradicted his pretrial memorandum, which indicated his assent to an October 8, 2001, merger date. Respondent's pretrial memorandum stated that Mr. Klaas transferred all his KDI shares to Apex in exchange for Apex stock on October 8, 2001. Nevertheless, the parties did not stipulate the merger date. Moreover, respondent's position in his pretrial memorandum is inconsistent with petitioners' position that Mr. Klaas transferred the KDI stock in a capital contribution and not in the merger transaction. In the petition, petitioners assigned error to respondent's determination that Apex and KDI entered into a merger transaction and alleged that Mr. Klaas contributed his KDI stock to Apex in a transaction separate from the merger, relying on substance over form principles. Under petitioners' argument, they would have to establish whether Mr. Klaas transferred the KDI stock in a capital contribution or in the merger transaction and when he transferred the KDI stock. Petitioners should have known that the date of the merger relative to the date of the sale was at issue.

Regardless of which theory respondent relies on, the issue is which entity owned Silver Spur on the date of sale. The issue as presented by petitioners under their contribution theory is essentially the same issue presented under respondent's effective date argument--whether Mr. Klaas owned KDI at the time of the sale. Petitioners are not required to introduce any additional

or different evidence as their own argument depends on who was the ultimate owner of Silver Spur at the time of the sale. Nor have petitioners suggested that the record contains insufficient facts to permit us to decide the effective date of the merger or to consider respondent's argument. Even if respondent's effective date argument is a new issue, it should not surprise or prejudice petitioners.

Petitioners have not taken a position as to when the merger occurred. Petitioners would have difficulty arguing that the merger occurred before the sale. Under the terms of the merger plan, KDI ceased to exist upon the merger, and Apex was the surviving entity. Under Washington State law, when a merger takes effect, the target corporation merges into the surviving corporation and the separate existence of the target ceases, and the title to all real estate owned by the target is vested in the surviving corporation. Wash. Rev. Code Ann. sec. 23B.11.060(1)(a) and (b) (West 1994). If the merger had occurred before the date of the sale, KDI would have ceased to exist, Apex would have been the surviving entity, and Apex should have been listed in the sale documents as the seller, not KDI. All the sale documents for Silver Spur show KDI as the signatory on the sale and thus still in existence at the time of the sale. A finding that the merger occurred before the sale of Silver Spur would be inconsistent with petitioners' reporting of the sale

because KDI would not have existed after the merger. On brief petitioners acknowledge that the merger did not take place until after the sale, stating: "At the time of the sale KDI was Silver Spur RV park's sole member." Petitioners' position on brief is inconsistent with KDI's 2001 short-year return, which reported that the merger occurred on October 15, 2001.

Petitioners do not take a position as to whether the merger occurred before or after the sale. Instead, petitioners argue that Mr. Klaas's contribution of his KDI stock to Apex was separate from the plan of merger. The record does not establish that Mr. Klaas made a capital contribution of his KDI stock to Apex before the sale of Silver Spur. The stipulation of facts contains a stipulation that is contrary to petitioners' assertion that Mr. Klaas transferred his KDI stock to Apex through a capital contribution and not through the merger transaction. The parties stipulated that "Mr. Klaas transferred all of his shares in KDI to Apex pursuant to the Plan of Merger, below. When it incorporated, Mr. Klaas funded KDI with a capital contribution of $4,777,399."[4]

The stipulation does not indicate whether Apex was funded with a contribution of KDI stock or from the proceeds from the sale of Silver Spur by KDI. Generally, a stipulation of fact is treated as a conclusive admission by the parties and is binding

---

[4]It appears that the stipulation contains an error and should refer to Mr. Klaas's funding of Apex.

on the parties.  Rule 91(e); Stamos v. Commissioner, 87 T.C. 1451, 1455 (1986).  We may modify or set aside a stipulation that is clearly contrary to facts in the record.  Jasionowski v. Commissioner, 66 T.C. 312, 318 (1976).  The Court will not allow a party to qualify, change, or contradict a stipulation except where justice requires.  Rule 91(e).  There is no documentation or fact in the record except for Mr. Klaas's self-serving testimony to establish a contribution of the KDI stock to Apex independent from the merger documents.  Petitioners are bound by the stipulation that Mr. Klaas transferred his KDI stock to Apex pursuant to the plan of merger.  Petitioners cannot argue that Mr. Klaas contributed his KDI stock to Apex before the merger occurred.[5]

Although petitioners have not taken a position as to when the merger occurred, petitioners' position relies on KDI's existence at the time of the sale.  Thus, petitioners implicitly acknowledge that the merger occurred after the sale; otherwise KDI would have not existed at the time of the sale.  Moreover, Washington State law supports respondent's position that the

---

[5]Respondent contends that under petitioners' contribution argument Mr. Klaas would also be taxable on the gain from his KDI stock at the time of the alleged contribution to a foreign corporation under sec. 367(a), resulting in double taxation at the corporate and shareholder levels.  Because respondent views Apex as a foreign corporation without a valid sec. 953(d) election to be treated as a domestic corporation, respondent argues that the nonrecognition rules of sec. 351 would not apply.

merger occurred upon the filing of the articles of merger on March 1, 2002, after the sale of Silver Spur. Washington State law provides that the surviving entity in a merger must file articles of merger with the secretary of state. Wash. Rev. Code Ann. secs. 23B.11.090 (West Supp. 2009), 23B.11.050 (West 1994). The plan of merger defined the effective time of the merger as the date of the filing of the articles of merger with the State. Washington State law recognizes the parties' right to abandon an authorized merger at any time before the filing of the articles of merger in accordance with the procedure set forth in the plan of merger. Wash. Rev. Code Ann. sec. 23B.11.030(9) (West 1994). The plan of merger between Apex and KDI permitted the termination of the plan of merger under certain circumstances at any time before the effective time. Thus, the merger between Apex and KDI could have been abandoned after the sale of Silver Spur and was not final at the time of the sale.

Finally, we note that Mr. Klaas chose to structure the transaction between KDI and the newly created Apex as a merger without any documentation that he planned to make his capital contribution of his KDI stock to Apex independent and separate from the merger transaction. Taxpayers are entitled to arrange and conduct their affairs and structure their transactions to minimize any adverse tax implications. Gregory v. Helvering, 293 U.S. 465, 469 (1935). Once having done so, taxpayers are

generally bound by the form of the transaction they chose and cannot disregard the chosen form when confronted with adverse tax consequences.  Commissioner v. Natl. Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974); Legg v. Commissioner, 57 T.C. 164, 169 (1971), affd. per curiam 496 F.2d 1179 (9th Cir. 1974).  There is nothing in the record except Mr. Klaas's self-serving testimony to suggest that the plan of merger did not properly reflect the transactions between KDI and Apex.  The parties structured the transaction in the form of a merger and executed the plan of merger to effect this result.

We find on the record and the stipulation of facts that Mr. Klaas did not contribute the KDI stock to Apex before the sale of Silver Spur.  We find on the basis of petitioners' contribution argument and the reporting of the sale documents that petitioners have conceded that the merger did not occur until after the sale of Silver Spur.  Thus, Mr. Klaas remained KDI's sole shareholder at the time of the sale and is subject to tax on the gain from the sale.

Because petitioners Klaas are liable for tax on the gain from the sale of Silver Spur, respondent concedes the adjustments against Apex for 2001 and the adjustments against Mr. Klaas for 2002.

## II.  Respondent's Alternative Arguments

As an alternative argument, respondent argues that Mr. Klaas should be directly taxed on the gain from Silver Spur under either the sham transaction or the step transaction doctrine in the event we find that a merger or contribution occurred before the sale.  Respondent further argues that Mr. Klaas is subject to tax on the sale of Silver Spur under section 367 or section 269.  Since we find as a matter of fact that Mr. Klaas remained KDI's sole shareholder at the time of the sale, we do not need to decide these issues.

## III.  Fraud Penalty Under Section 6663

Section 6663 imposes an addition to tax equal to 75 percent of any underpayment attributable to fraud.  Respondent contends that Mr. Klaas is liable for the section 6663 fraud penalty for 2001 on account of his failure to report the gain from the sale of Silver Spur.  Respondent bears the burden of proving fraud by clear and convincing evidence.  See sec. 7454(a); Rule 142(b); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).  Fraud is an intentional wrongdoing with the purpose of evading taxes believed to be owing.  See Neely v. Commissioner, 85 T.C. 934, 947 (1985).  To establish fraud, respondent must prove (1) an underpayment exists, and (2) Mr. Klaas intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.  See Parks v. Commissioner, 94

T.C. 654, 660-661 (1990).  We have found above that Mr. Klaas is taxable on the sale of Silver Spur as the sole shareholder of KDI.  He did not pay Federal income tax on the gain from the sale.  Therefore, he underpaid his tax for 2001.

The existence of fraud is a question of fact to be resolved upon consideration of the entire record.  DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d Cir. 1992).  Since direct evidence of fraud is rarely available, fraud may be proved by circumstantial evidence and reasonable inferences from the facts.  Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989).  Courts have developed a nonexclusive list of factors or "badges of fraud" that demonstrate fraudulent intent.  Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992).  These badges of fraud include:  (1) Understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of income or assets; (6) failure to cooperate with tax authorities; (7) filing false documents; (8) failure to make estimated tax payments; (9) dealing in cash; (10) engaging in illegal activities; and (11) engaging in a pattern of behavior that indicates an intent to mislead.  Vogt v. Commissioner, T.C. Memo. 2007-209.  No single factor is necessarily sufficient to establish fraud; however, a combination of several of these factors may constitute persuasive evidence of fraud.  Niedringhaus v. Commissioner, supra at 211.

Respondent argues that Mr. Klaas sought advice from tax shelter promoters and considered various tax shelter products before deciding to form a foreign insurance company to conceal the gain on the sale of Silver Spur. Respondent alleges that Mr. Klaas established Apex to reduce his U.S. tax liability from the sale of Silver Spur but still had access to the sale proceeds for his personal benefit as evidence by a purported loan in 2002. Respondent further alleges that Mr. Klaas concealed the transactions at issue by failing to report the gain on his individual return or KDI's return, even though he listed KDI as the selling entity.

Through his reliance on the stipulation of facts, respondent misstates the purpose of Mr. Klaas's first seeking advice from MSA. Mr. Klaas did not initiate a relationship with MSA for advice on tax products to shelter the gain from the sale of Silver Spur. The April 12, 1999, letter does not state that Mr. Klaas anticipated selling Silver Spur. In fact, the letter states the opposite, that he intended to keep the property and pull out equity to invest in other investment opportunities. Mr. Klaas sought MSA's advice on these other investment opportunities. Mr. Klaas sought tax planning advice from MSA regarding the sale of Silver Spur in December 1999 after receiving an unsolicited offer to purchase the property. Mr. Klaas decided not to pursue any of MSA's tax planning advice.

After making that decision, Mr. Klaas continued to negotiate the sale.  After Mr. Klaas received a second unsolicited offer in July 2001, he sought advice from Mr. Bishop and Mr. Fuller, then principals of Cornerstone, who recommended a foreign insurance company.  Mr. Klaas delayed the sale of Silver Spur so that he would have time to implement the tax planning strategies.  Although these actions establish that Mr. Klaas sought to minimize his tax liability from the sale, none constitutes fraud.

Clearly, Mr. Klaas was concerned about minimizing both his Federal and State tax liabilities from the sale of Silver Spur and discussed various ways to reduce his tax liabilities with his tax advisers.  Mr. Klaas acknowledged that one reason he formed Apex was to minimize U.S. tax on the sale.  Taxpayers are generally allowed to arrange their affairs and to structure their transactions to minimize any adverse tax consequences so long as the transactions have economic effect apart from their tax benefits.  See Gregory v. Helvering, 293 U.S. at 469; Zmuda v. Commissioner, 731 F.2d 1417, 1421 (9th Cir. 1984), affg. 79 T.C. 714 (1982).  Mr. Klaas failed to structure the transactions in a manner that reflected economic reality.  Although Mr. Klaas's dealings with MSA demonstrate that he wanted to minimize taxes, they do not support a finding of fraud.

The 2002 loan from Apex to Mr. Klaas is not evidence of fraud as respondent alleges.  Respondent contends that the loan

was part of a prearranged plan to take money out of Apex. Respondent has not established that the loan was part of a prearranged plan in which Mr. Klaas would have access to the sale proceeds for his personal benefit. Mr. Klaas credibly testified that he decided to use Apex's capital to repay his mortgage because Apex earned a low interest rate on its capital reserves. Mr. Klaas signed a note with a 4.5-percent interest rate and repaid the loan in 2003 when he sold the residence.

Respondent also contends that Mr. Klaas concealed the gain by failing to report the sale on his individual return or KDI's return. Mr. Klaas's failure to report the gain from the sale on his individual or KDI's return is not sufficient proof of fraud for the Court to sustain the section 6663 fraud penalty. Although the failure includes an element of concealment, Apex reported the sale on its Form 990. In addition, KDI reported the merger with Apex on its 2001 short-year return and attached the merger documents to the return. Apex's continued use of Form 990, instead of Form 1120, after respondent's determination that Apex did not qualify for tax-exempt status is not evidence of fraud, as respondent alleges, because Apex may challenge that determination.

Finally, respondent contends that Mr. Klaas made false and inconsistent statements including: (1) The execution of a listed transaction check sheet (the check sheet) dated November 1, 2004;

(2) the nonforeign status certification; and (3) Apex's section 953(d) election. We do not believe Mr. Klaas's submission of any of these documents constitutes fraud with an intent to conceal income. The check sheet included as prohibited transactions "Transactions that shifted income to related companies purported to be insurance companies that are subject to little or no U.S. federal income tax." Although the overly broad description used in the check sheet would arguably apply to Apex, the listed transaction identified by respondent--producer-owned reinsurance companies--does not apply to Apex. Notice 2002-70, 2002-2 C.B. 765. Moreover, the Internal Revenue Service eliminated such reinsurance arrangements from the list of listed transactions on September 24, 2004, before Mr. Klaas signed the check sheet. See Notice 2004-67, 2004-2 C.B. 600. Accordingly, we find that the check sheet is not evidence of fraud.

In the nonforeign certification Mr. Klaas claimed that KDI, a domestic entity, was the seller, thereby avoiding the 10-percent withholding requirement of section 1445(a) on the sale of U.S. real property by a foreign entity. However, petitioners now take an inconsistent position, claiming that Apex was the seller. While the position taken on the nonforeign certification is questionable, it does not establish fraud.

As further evidence of fraud, respondent contends that Apex improperly annualized the gain from the sale of Silver Spur for

purposes of its section 953(d) election, inflating its 2001 income to over $22 million to artificially enhance Apex's reserves and to mislead respondent into believing that Apex was maintaining an insurance business. Apex also incorrectly calculated its annual gross underwriting income for 2001 by failing to reduce its gross premiums by $325,000 for the premiums it ceded for reinsuring the three income replacement policies. See Notice 89-79, supra, 1989-2 C.B. at 393 (defining gross income as gross premiums written less return premiums and premiums paid for reinsurance). Although Apex may have made mistakes on its section 953(d) election statement, these mistakes do not constitute fraud. The question of whether Apex overstated its reserves does not affect the determination of which party was the seller of Silver Spur. Moreover, the incorrect calculations may be contrary to petitioners' interests; for example, the election reported annual underwriting income that would disqualify Apex from tax-exempt status. See sec. 501(c)(15)(A). The section 953(d) election is not evidence of Mr. Klaas's fraudulent intent to evade taxes on the sale of Silver Spur.

Respondent has not proven by clear and convincing evidence that Mr. Klaas's failure to report the sale of Silver Spur was fraudulent with the intent to evade taxes. Mr. Klaas engaged in aggressive tax planning to minimize his taxes on the sale of Silver Spur. However, his actions do not constitute fraud. Mr.

Klaas's limited experience as an accountant, where he prepared simple individual tax returns for 8 months following college, does not prove that he acted with fraudulent intent. We find that Mr. Klaas is not liable for the section 6663 fraud penalty for 2001.

IV.  Negligence Penalty Under Section 6662(a)

As an alternative to the fraud penalty, respondent determined that petitioners are liable for a section 6662(a) accuracy-related penalty for 2001 on account of their failure to report the gain on the sale of Silver Spur. Section 6662(a) and (b)(1) and (2) imposes a 20-percent penalty on an underpayment of tax that results from negligence or disregard of rules and regulations or from a substantial understatement of income tax. Negligence is defined as any failure to make a reasonable attempt to comply with the provisions of the Code. Sec. 1.6662-3(b)(1), Income Tax Regs. An understatement of income tax is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A).

The section 6662 penalty is inapplicable to the extent the taxpayer had reasonable cause for the underpayment and the taxpayer acted in good faith. Sec. 6664(c)(1). The determination of whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account the relevant facts and circumstances. Sec. 1.6664-

4(b)(1), Income Tax Regs. The extent of the taxpayer's efforts to assess the proper tax liability is generally the most important factor. Id. Good faith reliance on professional advice concerning tax laws may be a defense to negligence penalties. United States v. Boyle, 469 U.S. 241, 250-251 (1985); see also sec. 1.6664-4(b)(1), Income Tax Regs. Reliance on professional advice is not an absolute defense to negligence, but a factor to be considered. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).

Petitioners contend that they are not liable for the section 6662(a) penalty because Mr. Klaas reasonably and in good faith relied on the advice of tax professionals in forming Apex. Despite the advice received from tax professionals, petitioners have not demonstrated that they acted with due care in reporting the sale of Silver Spur. Mr. Klaas engaged in aggressive tax planning to minimize his taxes on the sale of Silver Spur. Mr. Klaas was aware of the potential risks associated with an offshore insurance company and nevertheless chose to structure the transactions in this matter. Mr. Klaas maintains that he intended to operate Apex as a profitable insurance business. However, he made no serious effort to achieve that result in the years following Apex's inception. Mr. Klaas claimed that he pursued niche markets within the insurance industry. However,

his actions show that he was not willing to accept the risks associated with the insurance business as he abandoned the market once an insurance claim was filed.

Furthermore, Mr. Klaas negotiated the sale of Silver Spur and executed the sales documents which listed KDI as the selling entity. As an experienced and successful businessman, Mr. Klaas should have been aware that the sale documents did not comport with the plan of merger because KDI would cease to exist when the merger occurred. Mr. Klaas should have also known that the articles of merger were not filed until after the sale. Mr. Klaas did not rely on professionals to negotiate the sale of Silver Spur or prepare the sale documents. We find that the underpayment is attributable to negligence. Accordingly, petitioners are liable for the section 6662(a) and (b)(1) accuracy-related penalty for 2001.

To reflect the foregoing,

<u>Decision will be entered for petitioner in docket No. 16774-06.</u>

<u>Decision will be entered under Rule 155 in docket No. 19803-06.</u>